# Staunton.

## Big Vein Pocahontas Company *v.* Ollie H. Browning, et als.

September 20, 1923.

1. Arbitration and Award—*Revocation of Submission—General Rule.*—
The authority of arbitrators, where they are required to pass upon
the ultimate liability of the parties, may be revoked at any time
before the award is made; and the agreement to arbitrate will be no
bar to an action on the original contract, because such a course is
supposed to oust the courts of their jurisdiction.

2. Arbitration and Award—*Revocation of Submission—Remedy.*—Under
the Virginia statute, submission by rule of court is not revocable
except by leave of court. Other submissions may be revoked at any
time before the award is made, with liability on the revoking party
to an action for damages for the breach, but this is of little value
where the damages are not liquidated. The only remedy is an ac-
tion for damages for breach of the submission.

3. Arbitration and Award—*Revocation of Submission—Remedy—Dam-
ages for Breach of Agreement to Submit.*—The agreement is no bar to
an action at law or a suit in equity on the original cause of action,
and no foundation for a suit for specific performance. If damages
are sought for breach of the agreement to submit, the measure of
recovery is the costs and expenses incurred, unless there be a bond
with penalty in the nature of liquidated damages.

4. Arbitration and Award—*Revocation of Submission—Express or Im-
plied—Written or Oral.*—The revocation may be express or implied,
and may be in writing or oral, though it is sometimes said that if
the submission is under seal the revocation must be also. But unless
the matter submitted embraces some matter required by law to be
in writing, a written unsealed contract stands on no higher footing
than an oral contract; nor is it clear that a sealed contract may not
be discharged by parol.

5. Arbitration and Award—*Revocation of Submission—Decision of Ar-
bitrators a Condition Precedent to Right of Action.*—The general rule
that submission to arbitration is subject to revocation at any time
before final award is subject to an exception, namely, that the par-
ties may, by contract, lawfully make the decision of the arbitrators

a condition precedent to a right of action on the contract. In such case, until the decision is made, the courts have no jurisdiction of case, and, therefore, cannot be said to be ousted of their jurisdiction. The condition may be express or implied; but the implication, if an implied condition is relied on, must be so plain that a contrary intention cannot be supposed.

6. Arbitration and Award—*Revocation of Submission—Decision of Arbitrators a Condition Precedent to Right of Action.*—In determining whether arbitration is a condition precedent to a right of action, the governing principle seems to be that if there is an absolute covenant to pay, and a collateral provision that the amount shall be ascertained by arbitration, such arbitration is not a condition precedent to the maintenance of an action on the covenant, but if the parties have covenanted that the liability is only to arise after the amount has been adjusted by arbitration, then such adjustment is a condition precedent to the right to recover.

7. Mines and Minerals—*Agreement to Submit to Arbitration—Revocation—Whether Agreement a Condition Precedent to Suit—Case at Bar.*— A mining lease contained an absolute obligation to pay royalties. It also contained an agreement that the lessee should pay minimum royalties at a specified rate during the continuance of the lease, and that when the lessee had paid an amount of royalties equal to the amount of royalties payable for all the coal contained or estimated to be contained in the subject of the lease, then the obligation upon the lessee should cease; and further contained a covenant to arbitrate the question of whether the lessee had paid such sum.

   *Held:* As the arbitrators were empowered to render a decision which should be "final and binding, without right of appeal," it could not be said that the decision of the arbitrators was a condition precedent to the maintenance of a subsequent suit, and that while the agreement to arbitrate was a valid contract for the breach of which an action for damages would lie, it could not be specifically enforced, and either party had a right to revoke the agreement and bring suit on the original cause of action.

8. Mines and Minerals—*Agreement to Submit to Arbitration—Revocation—Sealed Instrument—Case at Bar.*—A mining lease contained a provision for arbitration. The lease was under seal and not signed by the lessee. Upon request of the lessors that the matter in dispute be referred to arbitration, the lessee in a written notice declined to proceed with the arbitration and revoked and annulled the agreement to submit to arbitration the matter of the alleged dispute.

   *Held:* That the lessee's assumption of the obligation of the terms of the lease by accepting the deed and taking possession under it was an implied assumption, not in writing; that this implied assumption of the obligations contained in the deed of lease, which was executed under seal, did not in itself convert such implied assumption into a

written agreement under seal, and that the notice of the revocation of the arbitration agreement was sufficient, though not under seal.

9. DEEDS—*Deed Accepted but not Signed by Grantee—Grantee's Obligation not a Specialty.*—Where a grantee accepts a deed and enters into possession under it, the grantee becomes liable to perform any promise or undertaking therein imposed upon him, but the grantee's agreement to the covenants of the deed is not a specialty or contract under seal, and an action of covenant will not lie upon it at common law.

10. ARBITRATION AND AWARD—*Revocation of Submission—Revocation by Corporation—Vice-President of Corporation—Case at Bar.*—The power to revoke an arbitration agreement entered into by a corporation is vested in its board of directors. In the instant case, however, while the notice of revocation of the agreement to arbitrate was signed by the vice-president of the corporation, the corporate seal of the corporation was in fact affixed thereto, and this was sufficient, in the absence of proof to the contrary, to show the authority of the vice-president in executing it.

11. CORPORATIONS—*Effect of Corporate Seal.*—The presence of the corporate seal establishes, *prima facie*, that the instrument to which it is affixed is the act of the corporation, and dispenses with the necessity of any proof, on the part of the person claiming under it, that it was executed by the proper officers, that they had authority to so execute it, and that all proceedings, of whatever character, necessary to such authority, had been duly given, unless the corporation shall first by competent evidence on its part have rebutted the presumption arising from the presence of the common seal.

12. ARBITRATION AND AWARD—*Revocation of Submission—Revocation by Corporation—Pleadings—Estoppel—Case at Bar.*—In the instant case complainant, a corporation, was a party to an agreement to submit certain matters to arbitration. The vice-president of the corporation gave notice in writing, to which was affixed the corporate seal, to the other party to the arbitration agreement of the revocation by complainant of the agreement. Defendants objected to the sufficiency of this revocation because it was signed by the vice-president of the corporation. Complainant's bill alleged that it had given notice to defendants of the revocation of the arbitration agreement and defendants' answer admitted receiving the notice from the complainant.

*Held:* That after this admission, defendants were estopped to object to the sufficiency of the notice on the ground that it was signed by the vice-president, especially in view of the fact that defendants failed to introduce any evidence to rebut the *prima facie* presumption that the instrument to which the seal was affixed was the act of the corporation.

13. MINES AND MINERALS—*Mining Lease—Minimum Royalties—Available Coal—Merchantable Coal—Case at Bar.*—A mining lease provided that

the lessee should pay the lessors a certain sum annually as a minimum royalty under the lease, but, if the minimum royalty was in excess of the coal actually mined, then the lessee might stop paying royalty when the excess minimum royalty was sufficient "to cover all of the remaining available and merchantable coal contained in the vein."

*Held:* That under the terms of the lease fairly and reasonably construed, "available" coal included all coal recoverable as a practical and reasonable mining proposition, considering actual conditions, cost, and all the surrounding circumstances, and that "merchantable" in the lease did not mean coal which under all conditions could be handled at a profit, but coal which was ordinarily used, for sale, and could be usually sold at a profit.

14.  MINES AND MINERALS—*Mining Lease—Minimum Royalty—Case at Bar.*—In the instant case the position of complainant, lessee in a mining lease, was that it was properly chargeable with a royalty only on the available and merchantable coal, if any, remaining unmined on the date of the stoppage of the royalty payments, in excess of the amount covered by the advanced minimum royalty already paid. The contention of the lessors was that under the lease the lessee obligated himself to pay for all the available and merchantable coal that was turned over to him, at the commencement of the lease, and that if coal had been rendered unavailable by the negligence or wrongful mining of the lessee, lessors should be paid for same.  The lease contained a provision that if the lessors should at any time be of the opinion that the mines were not being worked in the proper manner by the lessee, the question should be submitted to arbitrators, and the lessee required to operate the mines in accordance with the findings of such arbitrators.  There was no evidence that the lessee had not fulfilled all covenants as to proper working in the mines, and the lessors acquiesced in the lessee's manner of working the coal for a period of two and one-half years after receipt of notice that the lessee would stop paying royalties.

*Held:* That the lessors had no right to establish the amount of coal contained in the leased premises at the date of the lease as a basis for determining the liability of the lessee for royalties upon the amount of merchantable and available coal remaining at the date on which the payment of royalties ceased.

15.  LANDLORD AND TENANT—*Deeds—Construction of Lease.*—In construing a deed of lease, the language used must be construed most strongly against the grantor and the intention of the parties must be ascertained by reference to the entire instrument and not to disjointed parts of it.

16.  MINES AND MINERALS—*Mining Lease—Lease to be Construed as a Whole.*—In the instant case the obligation imposed upon a lessee by a clause in a mining lease to continue the payment of the annual minimum royalties, until the lessee shall have paid the same to the lessors for

all the coal contained in, or estimated to be contained in, the seam of coal subject to the terms of the lease, should be read in the light of the other provisions in the lease.

17. MINES AND MINERALS—*Mining Lease—Minimum Royalty—Inspection by Lessee—Estoppel.*—In the instant case it was clear that a mining lease read as a whole intended that the lessors should not only have the right but it should be their duty to inspect the working of the coal by the lessee, from time to time, and if of the opinion that the lessee had left or was leaving any available and merchantable coal standing, which in the opinion of the lessors, or their engineer, was not necessary to be left for the proper security of the works, to give notice thereof to the lessee with directions to remove the same.

*Held:* That where the lessors acquiesced for more than two years in the lessees' method of working the coal, they could not then object that the lessees by their method of working had left standing available and merchantable coal.

18. ESTOPPEL—*Estoppel by Conduct—Inducing Another to Act.*—Where a party to a transaction induces another to act upon reasonable belief that he has waived or will waive certain rights, remedies or objections, which he is entitled to assert, he will be estopped to insist upon such rights, remedies, or objections to the prejudice of the one misled.

19. ESTOPPEL—*Estoppel by Conduct—Definition.*—Estoppel by conduct is where one party has been induced by the conduct of another to do, or forbear doing, something which he would not, or would have done but for such conduct of the other party.

Appeal from a decree of the Circuit Court of Tazewell county. Decree for defendants. Complainant appeals.

*Affirmed in part; reversed in part.*

The opinion states the case.

*Greever & Gillespie* and *E. P. Keech, Jr.,* for the appellant.

*Chapman, Peery & Buchanan* and *Jackson & Henson,* for the appellees.

WEST, J., delivered the opinion of the court.

Ollie H. Browning and her husband and children were the owners of certain coal lands in Tazewell county, Virginia, from which they had been mining and removing coal for several years, the mining operations being known as the "Browning Mines."

On March 12, 1909, Ollie H. Browning in her own right and as guardian of her son, James S. Browning, Jr., and her husband, James S. Browning, who were the then owners of the property, executed a deed of lease to Thomas T. Boswell, by which they demised, let and leased to him for a period of fifty years from the first day of April, 1909, unless the coal should sooner be exhausted, their coal mining operations, together with the exclusive right of mining the coal from "Pocahontas" or "No. 3" vein, for the sum of $250,000 and the rents and royalties set forth in the deed of lease, which deed of lease was assigned in 1909 by said Thomas T. Boswell and wife to Big Vein Pocahontas Coal Company, a West Virginia corporation, and that company operated under the deed of lease until the same was sold and conveyed in 1915 to the complainant, Big Vein Pocahontas Company, by deed from Geo. W. St. Clair, acting commissioner of the district court of the United States for the Western District of Virginia, by which the estate of the lessee in the leased premises became vested in the complainant, Big Vein Pocahontas Company, and subsequently the reversion in the lease vested in the defendants in this cause, namely, Ollie H. Browning, her husband James S. Browning, and her children, Willie Cameron Trotter, Reba Browning Koontz, Jane Browning Rees and James S. Browning, Jr.

In the deed from Geo. W. St. Clair, commissioner, to the complainant, complainant was granted "all the credits for unearned royalties," and by the deed complainant assumed the obligation imposed in the following language:

"Subject however to the payment of the royalties for the quarter beginning on the first day of January, 1915, and accruing and becoming payable for said quarter and thereafter, and to the performance of all of the other terms, provisions, covenants and agreements contained in said lease, in so far as the same are imposed thereby upon the lessee and are by him to be performed and discharged."

In clause "seventh" of the lease, the lessee "agrees to work and mine the coal according to some method of modern mining, and to the end that no *available* or *merchantable* coal shall be left unmined in the course of the work."

The "seventh" clause further provides that if the lessors, who are given full right of inspection of the mines "at all times," "at any time," are of the opinion that the mines "are not being worked in a proper manner," they "may give notice to the lessee that they desire to have such question submitted to arbitrators," in the manner provided in the lease; that the arbitrators shall examine the workings of the mine to determine whether the mines are being properly worked, "and to state in a report to the parties whether any change should be made in the manner of working, and in what manner the same ought to be worked," and "the lessee shall be obliged to work the mines according to the directions of such report, unless the lessors otherwise agree in writing," and if in the opinion of the lessors or their engineer the lessee is "leaving any *available* and *merchantable* coal standing," which is not necessary to be left for the proper security of the works, "the lessor *shall give notice* to the lessee thereof, with directions to remove the same," and if the lessee shall refuse to mine and take away the same, according to the directions of the lessors or their engineer, for the space of one week

after the receipt of such notice, the question of whether the coal is or is not necessary for the security of the works, and is or is not merchantable shall be forthwith submitted to arbitrators, as hereinafter provided, to determine and report whether any, and if any, how much, *available and merchantable coal has been left standing* which ought to have been mined and taken away, and the lessee shall pay the lessor *at the time of the payment of the royalty due next after any such report* of said arbitrators, or a majority of them, the sum of fifteen cents for each and every ton of such *available and merchantable coal so left standing,* just as though the same had been mined and taken away."

Clause "ninth" of the lease provides that the lessee shall pay to the lessors at least the sum of $45,000.00 annually in equal quarterly instalments of $11,250.00 each, as a minimum royalty under the lease, but, if the minimum royalty is in excess of the coal actually mined, then the lessee may stop paying royalty when the excess minimum royalty is sufficient, at the rate of fifteen cents per gross ton of 2,240 pounds, to *cover all* of the remaining *available and merchantable coal* contained in the vein.

Clause "ninth" also provides as follows: "Whenever the lessee shall claim that he has paid to the lessors the royalty at the rate aforesaid, upon and for all the coal contained or estimated to be contained within the vein, *subject to the terms and provisions* of these presents, he shall give notice of the fact to the lessors, and if the lessors shall dispute the same, the matter shall be referred to arbitrators, as hereinafter provided, for the purpose of determining whether any, and if any how much available and merchantable coal is contained or estimated to be contained within said vein, for which the lessee has not paid royalty at the rate aforesaid, and

the lessee shall continue thereafter to pay royalties hereunder at the rate aforesaid, until he shall have paid royalties at such rate upon and for every ton of coal contained or estimated to be contained in said vein as aforesaid, according to the report of said arbitrators, or a majority of them, but no longer."

On October 13, 1917, the complainant notified Ollie H. Browning and the other assignees of the original lessors, in writing, that it claimed that there had been paid to the lessors the royalty at the rate specified in the lease upon and for all the available and merchantable coal contained in the vein, and that the obligation upon it to pay royalties under said lease had ceased and come to an end.

On April 17, 1920, two and one-half years after the complainant's notice to the defendants, counsel for Ollie H. Browning, James S. Browning (who had no interest in the matter at that time), and James S. Browning, Jr., but not Reba Browning Koontz, Willie Cameron Trotter and Jane Browning Rees, gave notice that they disputed complainants' claim that it had paid a sufficient amount to cover all the available and merchantable coal remaining to be mined, and requested that the matter in dispute be referred to arbitrators, and selected W. R. Graham, an engineer who had before that time been in the employment of the defendants and had made inspections of the mines and reports of the conditions therein for the defendants, as one of the arbitrators.

April 23, 1920, complainant, in a written notice to Ollie H. Browning, J. S. Browning and J. S. Browning, Jr., acknowledged receipt of the notice of April 17, 1920, and gave notice that it declined to proceed with the arbitration as suggested in said paper of April 17, 1920, as it was not a valid notice for reasons stated therein, and

revoked and annulled the agreement, if any such there was, to submit to arbitration the matter of the alleged dispute mentioned and referred to in said notice of April 17, 1920.

W. R. Graham and George Wolfe were chosen arbitrators by the defendants and these two selected N. H. Mannakee as the third arbitrator. After notice from the complainant that it declined to proceed with any such arbitration and denied their power and right and the right and power of Ollie H. Browning and others to proceed with the same in any manner or way which could or would bind complainant, or in any manner affect its rights, interests and obligations in the premises, these three arbitrators proceeded with the arbitration, without any participation in the hearing on the part of complainant, and returned an award on July 12, 1920, in part as follows:

"We, the said arbitrators, therefore find that the said lessors are entitled to recover from the said Big Vein Pocahontas Company, and we accordingly award unto the said lessors, the said Ollie H. Browning, James S. Browning and James S. Browning, Jr., in such proportion as they may be entitled to have the same as against said Big Vein Pocahontas Company, the said sum of $128,646.15, with interest," etc.

The foregoing facts, which are taken substantially from complainant's petition, are admitted to be among the facts in the case.

On July 29, 1920, Ollie H. Browning, James S. Browning, James S. Browning, Jr., Reba Browning Koontz, Willie Cameron Trotter and Jane Browning Rees instituted an action at law *in assumpsit* in the circuit court of Tazewell county on said award, asking for a judgment thereon.

On January 22, 1921, complainant presented to that

court its bill asking that the plaintiffs in the action at law be enjoined from the prosecution of same, and that said award be declared void for legal and equitable reasons set forth in its bill.

The plaintiffs in the action at law filed their answer and cross-bill to complainants' bill, denying that the award was void, and asking to recover of complainant the amount thereof, and if the court should hold the award void, that they recover such sum as the court might find from the evidence they were entitled to recover.

On January 22, 1921, the court enjoined the prosecution of the action at law until the further order of the court. On February 24, 1921, complainant filed its answer to the cross-bill, denying that the defendants were entitled to recover any amount for the reasons set out therein, to which complainants replied generally.

Evidence was duly taken and filed and on August 26, 1922, the court entered a decree declaring the award valid and giving judgment for the amount thereof, and further adjudging that, even though the award is invalid, the evidence in the case shows that the plaintiffs in the cross-bill are entitled to recover of the Big Vein Pocahontas Company at least the sum fixed by the arbitrators in their award. From that decree this appeal was allowed.

The plaintiff alleges that the court erred—

(1) In not sustaining petitioner's motion to strike out certain of the evidence in this cause set forth in its written motion.

(2) In holding that there was no fraud or gross mistake on the part of the arbitrators for which the award should be set aside.

(3) In holding that the arbitration agreement had not been legally revoked by petitioner.

(4) In holding the award of the arbitrators valid and not void.

(5) In holding that, even though the award is invalid, the defendants are entitled to recover of petitioner at least the sum fixed by the arbitrators in their award, and in ordering that the defendants recover of petitioner the amount set forth in its decree of August 26, 1923.

(6) In not holding that defendants are not entitled to recover any amount of petitioner for any available and merchantable coal remaining in said leased premises to be mined and removed by it, and in not enjoining the further prosecution of said action at law.

The defendants assign as error on cross-appeal the following:

(1) The failure of the lower court to decree a recovery to appellees, in addition to the amount of the award, of the further sum of $4,250.20 covering the tonnage of coal mined from the railroad right of way.

(2) If this court should be of the opinion that the award is invalid and that the lower court should have so held, then the decree should have awarded a recovery in favor of the appellees in the sum of $165,506.65, with interest.

The third and fourth assignments of error by the complainant involve this question: Was the award of the arbitrators valid and unimpeachable? We must answer this question in the negative.

[1] It is settled law that the authority of arbitrators, where they are required to pass upon the ultimate liability of the parties, may be revoked at any time before the award is made; and the agreement to arbitrate will be no bar to an action on the original contract, because such a course is supposed to oust the courts of their jurisdiction. Burks' Pleading & Practice (2d ed.), sec.

16; *Corbin* v. *Adams*, 76 Va. 58; and *Rison* v. *Moon*, 91 Va. 384, 22 S. E. 165.

In *Corbin* v. *Adams, supra,* at page 61 of 76 Va., it is said: "Such an agreement not consummated by an award is universally held to be no bar to a suit at law or equity; nor can it be the foundation of a decree for specific execution. In its very nature it must rest on the good faith and consent of the parties concerned. Parties litigant cannot by such agreements oust the jurisdiction of the courts or deprive themselves of the right to resort to the legal tribunals for the settlement of their controversies." Citing Morse on Arbitration, 79, 90.

[2] In Burks' Pleading & Practice, sec. 16, *supra,* we find this: "Under the Virginia statute, submission by rule of court is not revocable except by leave of court. Other submissions may be revoked at any time before the award is made, with liability on the revoking party to an action for damages for the breach, but this is of little value where the damages are not liquidated. The only remedy is an action for damages for breach of the submission."

[3, 4] "The agreement is no bar to an action at law or a suit in equity on the original cause of action, and no foundation for a suit for specific performance. If damages are sought for breach of the agreement to submit, the measure of recovery is the costs and expenses incurred, unless there be a bond with penalty in the nature of liquidated damages. The revocation may be express or implied, and may be in writing or oral, though it is sometimes said that if the submission is under seal the revocation must be also. In 2 Am. & Eng. Ency. of Law (2d ed.), 599, it is said that the revocation must be of the same dignity as the submission, and, in the notes, that 'a written submission requires a written revocation; a submission under seal can only be

revoked under seal.' The same or equivalent language is used in Law of Contracts, Special Topics, p. 285, and practically the same authorities are cited. But unless the matter submitted embraces some matter required by law to be in writing, a written unsealed contract stands on no higher footing than an oral contract; nor is it clear that a sealed contract may not be discharged by parol."

[5, 6] This general rule is subject to an exception, namely, that the parties may, by contract, lawfully make the decision of the arbitrators a condition precedent to a right of action on the contract. In such case, until the decision is made, the courts have no jurisdiction of the case, and, therefore, cannot be said to be ousted of their jurisdiction. *Condon* v. *Southside R. Co.*, 14 Gratt. (55 Va.) 302.

In Corpus Juris, "Arbitration and Award," paragraph 71C, we find this: "The condition may be either express or implied; but the implication, if an implied condition is relied on, must be so plain that a contrary intention cannot be supposed. In other words the implication is tantamount to a direct expression only because nothing else is inferable. In determining whether arbitration is a condition precedent, 'the governing principle,' as stated by an able commentator on arbitration, 'seems to be that if there is an absolute covenant to pay, and a collateral provision that the amount shall be ascertained by arbitration, such arbitration is not a condition precedent to the maintenance of an action on the covenant, but if the parties have covenanted that the liability is only to arise after the amount has been adjusted by arbitration, then such adjustment is a condition precedent to the right to recover.' "

In *Hamilton* v. *Home Ins. Co.*, 137 U. S. 370, 11 Sup. Ct. 133, 34 L. Ed. 708, the court, speaking through

Justice Gray, says: "The rule of law upon this subject was well stated in *Dawson* v. *Fitzgerald* by Sir George Jessel, master of the rolls, who said: 'There are two cases where such a plea as the present is successful; first, where the action can only be brought for the sum named by the arbitrators; secondly, where it is agreed that no action shall be brought until there has been an arbitration or that the arbitration shall be a condition precedent to the right of action. In all other cases where there is first a covenant to refer, the covenants are distinct and collateral, and the plaintiff may sue on the first, leaving the defendant to bring an action for not referring  *  *  *  .' "

In *Flavelle* v. *Red Jacket Co.*, 82 W. Va. 295, 96 S. E. 600, the Supreme Court of West Virginia says: "Where a contract manifests an intention of the parties to give an award of arbitrators finality upon the question of the amount to be paid for a breach of some of its provisions, but not to grant to the arbitrators or their award a conclusive effect in determination of a general liability, there can be no question of the validity of the provision.  *  *  *  However, in the absence of such a provision (i. e., express agreement that arbitration is a condition precedent to action), either expressed in the contract or necessarily implied from its terms, the agreement for the submission of the amount to arbitration is collateral and independent, the authorities say, and also, while a breach of the agreement will support a separate action, it cannot be pleaded in bar to an action upon the principal contract." Citing authorities, amongst them *Hamilton* v. *Home Ins. Co.*, *supra*.

[7] Clause "fifth" of the lease contains an absolute obligation to pay, since it provides that the "lessee covenants and agrees to pay the lessors  *  *  *. the following royalties, namely, fifteen cents upon each and

every long ton  *  *  *  of coal mined, dug, carried away from or used on the land."

The "ninth" clause of the lease states that the lessee shall pay minimum royalties at the rates therein specified, "during the continuance of this lease, as a minimum royalty under the same, whether the quantity of coal mined in the respective years shall yield that amount of royalty or not  *  *  *  and when the lessee shall have paid to the lessors a total amount of money which shall equal the amount of royalties payable to the lessors hereunder for all the coal contained or estimated to be contained in the seam of coal, subject to the terms of these presents, then the obligation upon the lessee shall cease  *  *  *." This section also contains a further secondary covenant to arbitrate, under certain conditions.

In *Jefferson Fire Ins. Co.* v. *Bierce* (C. C.), 183 Fed. 588, where the agreement for arbitration provided that differences under the principal contract should "be referred to arbitrators, whose decision shall be final," the parties "waiving the right of appeal," the court said: "A more complete ouster of courts from all jurisdiction could not well be formulated; and it is void under the familiar rule declared by the English courts in *Scott* v. *Avery*  *  *  *  and by the United States Supreme Court in *Home Ins. Co.* v. *Morse,* 20 Wall.   445 (22 L. Ed. 365).

The arbitrators in the instant case being empowered to render a decision which is "final and binding, without right of appeal," it cannot be said that the decision of the arbitrators was a condition precedent to the maintenance of a subsequent suit.   Only such agreements as do not undertake to vest power in the arbitrators to determine the question of the general liability, or as make the award of arbitrators a condition precedent to the

maintenance of a subsequent suit in the courts, are held to be valid and irrevocable.

It follows from what we have said that the agreement to arbitrate is a valid contract for the breach of which an action for damages will lie, but it cannot be specifically enforced. And either party, at any time before the award was made, had the right to revoke or repudiate the agreement and bring suit on the original cause of action. By such revocation the "submission" is ended.

[8] We dissent from the contention of the defendants that the arbitration agreement in the instant case was not revoked in the manner prescribed by law. The complainant did not sign the deed from Commissioner St. Clair, conveying to it the estate of the lessee in the leased premises, and its assumption of the obligation of the terms of the lease by accepting the deed and taking possession under it was an implied assumption, not in writing. Complainant's implied assumption to carry out the obligations contained in the deed of lease, which is executed under seal, does not in itself convert such implied assumption into a written agreement under seal.

In *Taylor* v. *Forbes' Adm'r,* 101 Va. 658, 663, 44 S. E. 888, 889, the court said: "The determination of that question depends upon the character of the contract by which Mrs. Taylor and Mrs. Forbes assumed the payment of the notes in suit. The deed by which Harrison conveyed the lots to Mrs. Taylor and Mrs. Forbes states that the parties of the second part assume, and covenant to pay off and discharge, the said notes. Neither Mrs. Taylor nor Mrs. Forbes signed the deed, but they accepted it and took possession of the lots under it.

[9] "The authorities are agreed that, by accepting a deed like the one under consideration, the grantee becomes liable to perform any promise or undertaking

therein imposed upon him, but they are in conflict as to the character of the undertaking.

"It is held in some of the States that an agreement of the grantee in a deed signed and sealed by the grantor only is in the nature of a covenant under seal, and consequently a specialty. In others it is held that such an agreement is in the nature of an assumpsit or implied contract arising from the acceptance of the deed, and consequently a simple contract.

"Counsel have not cited, nor have we found in our investigation, any decision of this court in which that question was considered and passed upon. That such an agreement is not a specialty or contract under seal, and that an action of covenant will not lie upon it at common law, is the accepted doctrine in this State, as we understand it."

We find no merit in the objections urged by the defendants that the notice to them of complainant's refusal to proceed with the arbitration was insufficient, (1) because it was not under seal, and (2) because it was signed by the vice-president of the complainant. As already suggested, a sufficient answer to the first objection is, that as complainant's obligation was not under seal, it was not required to have its notice of revocation under seal.

[10, 11] It is true, speaking generally, that the power to revoke an arbitration agreement entered into by a corporation is vested in its board of directors. In the instant case, however, while the notice was signed by the vice-president, the complainant's corporate seal was in fact affixed thereto, and this was sufficient, in the absence of proof to the contrary, to show the authority of the vice-president in executing it.

In a note to *B. S. Green Co.* v. *Blodgett* (Ill.), 50 Am. St. Rep. 155, the law is stated thus: "The reason why

it is desirable to attest all contracts and other acts of the corporation with its seal, when this is possible, is that the presence of such seal establishes, *prima facie*, that the instrument to which it is affixed is the act of the corporation, and dispenses with the necessity of any proof, on the part of the person claiming under it, that it was executed by the proper officers, that they had authority to so execute it, and that all proceedings, of whatever character, necessary to such authority, had been duly given, unless the corporation shall first by competent evidence on its part have rebutted the presumption arising from the presence of the common seal. It is sometimes said that the signature of the proper officers appearing, it will be presumed from the presence of the seal that it was affixed by them after being duly authorized to do so, but the rule is by no means limited to those cases in which it appears that the officers who executed the instrument were the proper officers to do so. In truth, as we understand the law, while it is usual for the officers who execute the instrument on behalf of the corporation to sign it themselves in their official capacity in such a way that an inspection of the writing will show what officers or agents undertook to act for the corporation, this is not necessary: *Jackson* v. *Walsh*, 3 Johns. 226; Angell and Ames on Corporations, sec. 225; *Doe* v. *Hogg*, 1 Bos. & P. N. R., 306; *Clark* v. *Farmers, etc., Co.*, 15 Wend. 256; Sugden on Vendors, 8th Am. Ed. 730. It is sufficient that the name of the corporation be written by some officer or agent, and we doubt, under the foregoing authorities, whether anything more is necessary than affixing of the seal. In other words, as we understand the rule, the sealing by a corporation has an effect equal to a signing and sealing by a natural person. It is not, however, usual to employ the seal alone. The common practice 'is to affix the

seal with a declaration that it is the seal of the corporation, and to verify the act by the signatures of the president and secretary of the corporation.'   *Kinzie* v. *Chicago*, 2 Scam. 187, 33 Amer. Dec. 443.

"A writing being produced upon which the seal of the corporation appears to be impressed, such seal entitled it to be received, *prima facie*, as the act of the corporation, and no evidence need be offered, in the first instance, to show by whom it was affixed, or that resolutions were adopted or measures taken which were necessary either to confer authority on the officer or agent who affixed it to act for the corporation, or that the corporation itself had taken such special steps as to entitle it to execute the instrument in question.   The use of the seal is presumed to be a lawful use: *Indianapolis, etc., R. R. Co.* v. *Morganstern*, 103 Ill. 149; *Leavenworth* v. *Rankin*, 2 Kan. 357; *Morris* v. *Keil*, 20 Minn. 531; *Evans* v. *Lee*, 11 Nev. 194; *Central Nat. Bank* v. *Charlotte, etc., R. R. Co.*, 5 S. C. 156, 22 Am. Rep. 12; *Mickey* v. *Stratton*, 5 Saw. 475;   *   *   *   *Koehler* v. *Black River, etc., Co.*, 2 Black. 715; *Lovett* v. *Steam Saw Mill Association*, 6 Paige 54; *Reed* v. *Bradley*, 17 Illinois 321; *Clark* v. *Imperial, etc., Co.*, 4 Barn. Adol. 315; Nev. & M. 206; *Hopkins* v. *Gallatin, etc., Co.*, 4 Humph. 403; *Musser* v. *Johnson*, 42 Mo. 74, 97 Am. Dec. 316; *St. Louis Public Schools* v. *Risley*, 28 Mo. 415, 75 Am. Dec. 131; *Burrill* v. *Nahant Bank*, 2 Met. 135, 35 Am. Dec. 395; *Berks, etc., Road* v. *Meyers*, 6 Serg. & R. 12, 9 Am. Dec. 402.   The seal itself is *prima facie* evidence that it was affixed to the deed or other instrument by authority of the corporation:   *Sheehan* v. *Davis*, 17 Ohio St. 571; *Levering* v. *Mayor*, 7 Humph. 553; *Southern, etc., Ass'n* v. *Bustamenti*, 52 Cal. 192; and upon a legal consideration:   *Best* v. *Thiel*, 79 N. Y. 15."

[12] In addition, complainant's bill alleges that, "your orator, in a writing under date of April 23, 1920, gave notice to said lessors  *  *  *." And the answer of the defendants says, "respondents admit receiving *from the complainant* the notice mentioned, dated April 23, 1920."

After this admission, the defendants are estopped to object to the sufficiency of the notice on that ground, especially in view of the fact that they failed to introduce any evidence to rebut the *prima facie* presumption that the instrument to which the seal is affixed is the act of the corporation.

For the foregoing reasons we are of opinion that the arbitration agreement was legally revoked by the complainant prior to the return of the award and that the award is invalid and not binding on the complainant.

This brings us to this question:

[13] Had there been paid to the lessors prior to October 13, 1917, the royalty at the rate specified in the lease, upon and for all the available and merchantable coal contained or estimated to be contained within the vein, and had the obligation upon complainant to pay royalties under the lease ceased and come to an end?

What is available and merchantable coal?

Under the terms of the lease fairly and reasonably construed, "available" coal includes all coal recoverable as a practical and reasonable mining proposition, considering actual conditions, cost, and all the surrounding circumstances.

"Merchantable" as used in the lease does not mean coal which under all conditions can be handled at a profit, but coal which is ordinarily used, for sale, and can be usually sold at a profit, since commodities are not generally sold on the market unless they can be disposed of at a profit.

In *McCorkle & Son* v. *Kincaid*, 121 Va. 546, 93 S. E. 642, this court approved the following definition of "merchantable" pine timber: "'Merchantable pine timber' referred to the sale and manufacture of pine timber and included such timber as was ordinarily used for sale or manufacture in that locality."

The coal demised by the lease in question lies in a narrow strip, about two miles long and one half mile wide at the widest point and about one quarter of a mile at its narrowest point. It lies under the bed of a narrow valley and the mountains which form the valley and rise abruptly from its sides. For its entire length the valley is traversed by Laurel creek and the right of way of the Norfolk and Western Railway, running close together in some places and further apart in others. Sufficient supports, barrier pillars as they are called, had to be left to support the railroad right of way and protect the mine itself from the waters of the creek. According to the preponderance of the evidence, these physical conditions would necessarily result in a low percentage of ultimate recovery.

The gross coal area, for convenience, may be divided into the Browning development, virgin territory, areas that should not be mined, and the upturned area.

[14] The position of the complainant is that it is properly chargeable with a royalty only on the *available* and *merchantable* coal, if any, remaining unmined on July 1, 1917 (the date of the stoppage of the royalty payments), in excess of the amount covered by the advanced minimum royalty already paid.

The contention of the defendants is that under the lease the lessee obligated himself to pay for all the *available* and *merchantable* coal that was turned over to him, at the commencement of the lease, April 1, 1909; that complainant assumed this obligation; and that if coal

has been rendered unavailable by the negligence, fault or wrongful mining of the lessee, or the complainants, lessors should be paid for same.

[15] In construing a deed of lease, the language used must be construed most strongly against the grantor and the intention of the parties must be ascertained by reference to the entire instrument and not to disjointed parts of it. *Stone Gap Colliery Co.* v. *Kelly,* 115 Va. 390, 79 S. E. 341, 48 L. R. A. (N. S.) 883; 2 Minor's Inst. 1956-1958.

The defendants base their right to recover the amount decreed in their favor by the lower court on that provision in clause nine of the lease which says, that the lessee shall pay "at such rate upon and for *every ton of coal contained or estimated to be contained in said vein,*" but recognize the fact that the lease does not contemplate a 100% recovery. This will appear from a statement, "Horizontal Coal," contained in appellees' brief. In this statement they deduct from the gross horizontal coal area of 320.63 acres eighteen and seventy-four hundredths acres for the N. & W. right of way, one and sixty-one hundredths acres for the five foot barrier pillar to be left along the exterior boundary line of the lease as required by statute, 118.60 acres for the entire Browning development, and nineteen and thirteen hundredths acres for barrier pillar 210 feet wide under Laurel creek; making a total deduction of 158.08 acres, and a *net area of virgin horizontal coal of 162.55 acres.*

On the agreed basis of 1,613 tons to each foot of thickness of the vein, accepting the minimum of ten feet for the thickness of the vein and treating ninety per cent of this coal as available and merchantable, they contend and conclude that the 162.55 acres, net area of virgin horizontal coal, as of April 1, 1909, should have yielded 2,359,819 gross tons of coal, for which they demand payment.

This statement, as to areas, is based on the MacFarland map showing an actual survey of the mines and the condition thereof as of April 1, 1909. But the conclusions *as to the tonnage* of available and merchantable coal which the entire seam should yield are based upon the *opinions and estimates* of the appellees' engineers.

[16] The obligation imposed upon the lessee by clause "ninth" in the lease to continue the payment of the annual minimum royalties therein provided, until the lessee shall have paid the same to the lessors for all the coal contained in or estimated to be contained in the seam of coal subject to the terms of the lease, should be read in the light of the other provisions in the lease.

Clause "seventh" provides that the lessee shall "work and mine the coal according to some approved method of modern mining, to the end that no available or merchantable coal shall be left unmined in the course of the work * * *."

Clause "sixth" provides that the lessee shall "keep books of account of the mining and shipping of coal and coke, and said books shall be open at all reasonable times for the inspection of the lessors—for the purpose of comparing and verifying the accounts or statements of royalties as rendered."

Clause "seventh" also further provides as follows: That "in case the lessors shall at any time be of the opinion that the mines opened in or on said coal premises, or any of them, are not being worked in a proper manner or are being worked in such a manner as would prove injurious to their future working," the question shall be submitted to arbitrators for determination; and the lessee is required to operate the mines in accordance with the findings of such arbitrators; that "the lessors shall also have the right, in person or by an engineer to be appointed by them, from time to time, to inspect the

workings of said coal by the lessee, and if, in the opinion of said lessors or of said engineers, the lessee shall have left or be leaving any available and merchantable coal standing, which in the opinion of the lessors or of said engineer is not necessary to be left for the proper security of the works as herein elsewhere provided, the lessors shall give notice to the lessee thereof with directions to remove the same" and the lessee is required, after due inquiry, to remove the coal so left standing and to "pay to the lessors, *at the time of the payment of the royalty due next after any such report* * * , the sum of fifteen cents for each and every ton of such available and merchantable coal, so left standing, just as though the same had been mined and taken away;" that the lessee "will drive or cause to be driven the regular size of gangways and airways through any such portions of said vein or seam of coal as may prove faulty or may fail to yield merchantable coal, and will leave no more available coal in the mining of openings or workings than may be necessary for their full security and the support of the roofs and sides of the gangways and other portions of said workings;" that "the lessors, in person or by agent, acting in their behalf, shall have the right to enter at all times the said mines and all other works, whether below or on the surface of the ground, in order to inspect, examine, survey or measure the same or any part thereof, or for any other lawful purpose, and for such purposes to use freely the means of access to the said mines and works without hindrance or molestation."

Clause "eighth" provides that the lessee shall "employ a competent mining superintendent or engineer, whose duty it shall be to keep up the mine surveys, and to give directions and courses of entries, rooms, and aircourses, and to plat the same on a map, on a scale not less than 100 feet to an inch, which map shall at all

reasonable times be open to the inspection of the lessors and their agents, and shall show all of the mine work done up to and including the period covered by each statement of royalties made hereunder. The lessors may at any time make a copy of any such map or maps."

Clause "fifth" provides that "the lessee shall pay royalties at the rate of fifteen cents per ton on all coal mined, the payments to be made quarterly on the 20th day of January, April, July and October in each year, for the quarter ending on the last day of the previous month, each such payment to be accompanied by a statement of the coal mined during the preceding quarter, and, as to all coal shipped by the railroad, by the certificate of the weigh-master or other proper official of the Norfolk and Western Railway Company."

We find no proof in the record that the original lessee and his successors in title, including the appellant, have not at all times complied with each of the foregoing covenants, which placed an obligation upon them.

Under the terms of the lease, the lessee had the right to adopt any approved method of modern mining which it thought proper and follow that method unless and until the same was objected to by the defendants and changed in accordance with the terms of the lease, which had never been done.

That the appellants adopted and followed a proper modern method of mining appears from the testimony of appellees' witnesses, W. R. Graham, W. T. Williams, and J. P. Williams, Jr. Graham says, "they were getting out as much coal as could be expected from this area of this new mine * * *. It is not in an ideal shape at all for mining." W. T. Williams says, "I can see their development has been made well. Unfortunately the property is strung out in one continuously narrow strip which has made it difficult to develop their

work in panels, from which a larger recovery could be obtained than they are realizing." J. P. Williams, Jr., says, "on the two occasions on which I inspected the Big Vein property * * I found the method used by the Big Vein Company to be thoroughly up to date, and methods designed for the best recovery of coal."

Lessees have kept books of account showing accurately the mining and shipping of the coal. They rendered statements accompanied by certificates of the Norfolk and Western Railway Company to the lessors each quarter, showing the amount of coal mined and the amount of royalties due. They employed engineer Jones, a competent engineer, who made and kept up accurate mine maps. They have not interfered with the right of the lessors to inspect the mines and that right has been exercised by them on many occasions.

It sufficiently appears from the evidence that the lessors knew that the appellant and its predecessor were leaving "top" coal to protect the roof, as required by clause "seventh" of the lease; that the Browning old workings were practically abandoned and many of the rooms and entries in that section and elsewhere partly filled with coal and slate, which would make it impossible, as a practical mining proposition, to re-enter and recover the coal remaining therein; that the barrier pillar along Laurel creek was being left 300 feet wide; and that the pillars in many portions of the mine were being "pulled" from time to time, and sections so pulled abandoned, and that any coal remaining could not be recovered, as available and merchantable coal.

[17] When the lease is read as a whole, it is clear that the intent and purpose of the parties thereto was not that the lessors should only have the *right* but that it was their *duty* to inspect the working of the coal by the lessee, from time to time, and if of the opinion that the

lessee had left or was leaving any available and merchantable coal standing, which in the opinion of the lessors, or their engineer, was not necessary to be left for the proper security of the works, to give notice thereof to the lessee with directions to remove the same. And the lessee is required to remove the coal so left standing and to pay to the lessors *at the time of the payment of the royalty due next after any such report* the sum of fifteen cents for each and every ton of available and merchantable coal so left standing.

The lessors, with full knowledge of the lessee's method and manner of working the coal, having acquiesced in and by their conduct approved what has been done, from April 1, 1909, to April 17, 1920, two and one-half years after the receipt of notice that the lessee would stop paying royalty, they are, in equity and good conscience, estopped from setting up at this time a theory of liability which is in conflict with their previous conduct. Having remained silent when the lessees could have corrected the alleged errors with little or no expense they cannot now be heard to complain when, under changed conditions the lessee cannot correct them without great loss. For reasons already suggested they are barred by the very terms of the lease from setting up such liability as to any coal which was mined prior to July 1, 1917.

[18] Where a party to a transaction induces another to act upon reasonable belief that he has waived or will waive certain rights, remedies or objections, which he is entitled to assert, he will be estopped to insist upon such rights, remedies, or objections to the prejudice of the one misled. 21 *Corpus Juris,* "Estoppel," sec. 247.

[19] Estoppel by conduct is where one party has been induced by the conduct of another to do, or forbear doing, something which he would not, or would have

done but for such conduct of the other party. *Bull v. Rowe*, 13 S. C. 370; Bigelow on Estoppel, 480.

It is clear that the silence of the lessors from April 1, 1909, until two and one-half years after receipt of notice that payment of royalties had ceased, caused the lessees to operate the mines according to a modern method of mining of their own selection, of which lessors now complain, and that if lessors had at the proper time complained that lessees were leaving available and merchantable coal standing which it was their duty to mine, lessees, if the complaint was sustained, would have mined the coal in accordance with appellees' contention.

It is also clear that the rejection, at this time, of the method of mining followed would work an injury to the appellant.

Justice and the rights of the appellant appeal to conscience and equity and furnish firm ground for the intervention of the court and the application of the principles of equitable estoppel.

The appellant relies upon the following statement based on actual measurements of its engineers and the amount of coal actually mined:

|  | Acres. | Acres. |
|---|---|---|
| Total area of horizontal coal in lease |  | 320.63 |
| Total area Browning old workings, including railroad, 6.18 acres, and creek (150 feet), 22.86 acres | 122.13 |  |
| Boundary line, barrier pillars | 1.61 |  |
| Railroad in new area | 13.86 |  |
| Creek (150 feet), new area | 28.94 | 166.54 |
| Total new area, exclusive of creek and railroad, etc. |  | 154.09 |

| | |
|---|---:|
| Remaining pillars in new area on July 26, 1921 | 43.03 |
| Area mined out of new territory, exclusive of railroad and creek, etc. | 111.06 |

|  | Tons. |
|---|---:|
| Total tonnage shipped over No. 2 tipple to July 26, 1921 | 1,292,370.46 |
| Total tonnage shipped over No. 1 tipple to July 26, 1921 | 255,102.58 |
| Total tonnage used at the power house and locally | 70,707.93 |
| Total coal mined | 1,618,180.97 |

| Deductions | Tons. | |
|---|---:|---:|
| Coal mined from Browning old territory to July 26, 1921 | 91,892 | |
| Coal removed from creek area to July 26, 1921 | 217,900 | |
| Total tons removed from railroad by Browning's lessees to July 26, 1921 | 35,566 | 345,358.00 |
| Total coal mined, less coal from creek, railroad and Browning old workings | | 1,272,822.97 |

1,272,822.97 tons divided by 111.06 acres equals 11,461 tons recovery per acre from horizontal coal in virgin territory as of the date of the lease.

11,461 divided by 16,130 equals seventy-one per cent, being the per cent of coal recovered in the territory which was virgin coal on April 1, 1909.

It sufficiently appears that according to the methods of mining adopted and followed by the lessees, with the knowledge and acquiescence of the lessors, the mines have been exhausted, except that there remained on July 26, 1921, in new territory, exclusive of railroad and creek, etc., forty-three and three-hundredths acres to be mined. Forty-three and three-hundredths acres at 16,130 tons per acre equals 694,073.90 tons. A seventy-one per cent recovery of the 694,073.90 tons equals 492,792.46 tons, at fifteen cents per ton equals $73,918.87 to be paid for remaining coal. The lessee's total credit royalty on July 26, 1921, was $58,500.45, $15,418.42 less than the amount due for the estimated remaining coal.

Having sustained the contention of the lessee that the coal in the old Browning workings, the coal necessary to protect the mine from being flooded by Laurel creek, the upturned or vertical coal and the coal in the squeezed area was not merchantable and minable coal within the meaning of the lease, and that they should not be required to pay for same, it follows that lessee has no right under the terms of the lease, during its further mining operations, to mine any of the coal in the Browning workings, or from the pillar necessary to properly support the creek, or the vertical coal, or coal in the squeezed area.

In mining the coal on the forty-three and three-hundredths acres, lessee has no right to remove all of the coal in that area, but shall leave enough coal in the

pillars and in the roof, at the proper places, to protect and keep open the haulways leading from the tipple and main outlet to the vertical or upturned coal, the old Browning mines and the squeezed area. When it shall have mined from the forty-three and three-hundredths acres, in the manner above indicated, the tonnage of 492,792.46 tons, its rights under the lease shall terminate, and lessee shall then deliver possession of the leased premises, together with the coal remaining unmined, to the lessors.

In view of the failure of the lessors, for eight years, to object to the method of mining adopted and followed by the lessees in working the mines, we concur with the contention of the appellant, that they had no right to establish the amount of coal contained in the leased premises on April 1, 1909, the date of the lease, as a basis for determining by a theoretical percentage of recovery the liability of the complainant for royalties upon the amount of merchantable and available coal remaining on the premises on July 1, 1917, the date on which the payment of royalties ceased.

We are not unmindful of the weight which should be given the judgment of the trial court. But, excluding the evidence thus improperly admitted, we find that the judgment complained of is contrary to the evidence and without evidence to support it.

It being admitted that lessees did not own the coal under the Norfolk and Western Railway, we find no error in the refusal of the lower court to decree a recovery to appellees of a further sum of $4,250.20 to cover tonnage of coal improperly moved from the railroad right of way. However, the appellant is not entitled to have the sum of $4,250.20 deducted from the above balance of $15,418.42, as contended, for the reason that the lessees did not have a right to mine and haul through

3

the leased premises coal from any adjacent lands, and under clause fourteen of the lease expressly agreed to pay a *rental* of fifteen cents per ton for all such coal passing over the dumps or tipples on the leased premises.

For the foregoing reasons we are of opinion that the decree complained of is erroneous and the same will be reversed and such a decree entered here as ought to have been entered in the lower court, adjudging that the defendants are entitled to recover of the complainant, for available and merchantable coal remaining in said leased premises, on July 26, 1921, to be mined and removed by it, the sum of $15,418.42 with interest on $11,250.00 part thereof, from October 20, 1917; and on the residue thereof from January 1, 1918, until paid; and enjoining the further prosecution of the action at law; and further adjudging that when the complainant shall have mined the remaining forty-three and three-hundredths acres of pillar coal in new area, all the available and merchantable coal transferred by the lease from St. Clair, commissioner, bearing date_____, 1915, will be exhausted and all the rights, duties and obligations of the complainant thereunder shall forever cease and be of no effect.

The appellant having substantially prevailed, it will be allowed to recover its costs in this court.

*Affirmed in part; reversed in part.*