618

## STONEGA COKE & COAL CO. v. PRICE et al.

### No. 4701.

Circuit Court of Appeals, Fourth Circuit.

Dec. 31, 1940.

Mercer B. Tate, Jr., of Philadelphia, Pa. (Edward G. Taulane, Jr., and E. H. Molthan, both of Philadelphia, Pa., Robert T. Hubard, of Fayetteville, W. Va., James L. Camblos, of Big Stone Gap, Va., and Montgomery & McCracken, of Philadelphia, Pa., on the brief), for appellant.

Robert G. Kelly, of Charleston, W. Va. (William L. Lee, of Fayetteville, W. Va., and Brown, Jackson & Knight, of Charleston, W. Va., on the brief), for appellees.

Before PARKER and DOBIE, Circuit Judges, and CHESNUT, District Judge.

PARKER, Circuit Judge.

This is the second appeal in a suit instituted to recover minimum rent or royalty under certain leases of coal lands. As the suit was originally instituted, recovery was asked for three quarterly instalments of rental then due, amounting to $9,000, and for general relief, and defense was made on the ground that defendant had withdrawn from the leases pursuant to the right reserved in certain withdrawal clauses, that the mine was practically exhausted at the time of withdrawal and that, at all events, defendant was released from further liability under the leases by reason of a settlement made by plaintiffs with the defendant's predecessor lessee. The issues thus raised were decided against defendant by the lower court, which entered a decree, not only for the instalments of rental for which the suit was brought, but also for future instalments by providing that defendant was bound to perform all the obligations of the lessee under the leases "until they shall be terminated by the mining and removal of all minable coal remaining in the Sewell seam of coal in the demised premises, unless said defendant has been lawfully released or discharged from such obligations since the thirtieth day of September 1932, or shall hereafter be so released or discharged therefrom". We affirmed the decree appealed from, except with respect to the adjudication that the liability under the leases should continue until they should be terminated by the mining and removal of all minable coal. Stonega Coke & Coal Co. v. Price, 4 Cir., 106 F.2d 411, 419.

On the former appeal, complaint was made of the decree that its effect was to impose liability for the minimum rental indefinitely in the future. We pointed out that, as the suit was one in equity, it was proper for the decree to speak as of the date of the decree and not merely as of the date of the institution of suit, and to adjudicate the rights of the parties as of that date, with provision for enforcement of rights to accrue in the future, if proper basis for such relief were laid in the pleadings. Referring to the fact that the language of the decree above quoted was too broad, we said: "The effect of this would be to impose liability for the minimum rental indefinitely in the future, although it is clear that liability should not be imposed for a longer period than that for which the 8 cent per ton royalty upon coal which could be mined profitably would pay such rental. Furthermore, there is nothing in the pleadings upon which to base such relief, unless it be the prayer for general relief. The decree appealed from will be modified, therefore, by eliminating therefrom the language contained in the last clause of paragraph four thereof. In other respects it will be affirmed; and the cause will be remanded to the end that the parties may file supplemental pleadings, if they so desire, and the court below may properly determine what rentals, in addition to the $9,000.00 for which recovery has already been granted, plaintiffs are entitled to recover under the provisions of their leases."

After the remand, plaintiffs filed an amended and supplemental complaint demanding the payment of rentals and taxes accrued up to that time with adjudication of liability for those to accrue in the future; and defendant filed answer in which the only defense asserted to plaintiffs' demand is contained in the following portion of the third paragraph:

"The conditions existing in the bituminous coal industry in 1931 have persisted and, indeed, become less favorable to profitable mining operations and to the Sun Mine in particular. Since the end of the period beginning with the year 1924 and ending with the year 1931, the defendant avers that substantial changes have occurred (a) in the general economic conditions affecting the nation as a whole, (b) in the conditions affecting the bituminous coal industry as a whole, (c) in the conditions with respect to the mining and marketing of coal by the producers thereof within the so called New River district of the State of West Virginia, (d) in the conditions affecting the further mining of coal at the Sun Mine if it had been continued in operation, (e) in the market prices for coal of the kind, quality and characteristics produced by the Sun Mine. The defendant further avers that the particular conditions at the Sun Mine would have, of necessity, produced a constantly declining rate of production, and a constantly increasing cost of operation, had the said mine been operated in fact subsequent to 1931. The defendant avers that at no time during the period beginning on January 1, 1932, and continuing to date, could it have been possible, nor would it in the future be possible, for the Sun Mine to operate at a profit, if it had

been continued in operation, after giving due consideration to all of the changes and conditions which have occurred since 1931 as hereinabove set forth and after giving due consideration to the specific conditions existing at the Sun Mine. Defendant avers that the said mine could not be operated at a profit under the conditions prevailing in the period beginning with the year 1932 and continuing to date, which conditions give promise to continue indefinitely in the future."

Plaintiffs thereupon moved for judgment on the pleadings; and the judge being of opinion that the only issue which the answer attempted to raise had been adjudicated contrary to the contention of defendant on the prior hearing, and that this adjudication had been affirmed on appeal, granted the motion. From this judgment defendant has appealed. The only question presented is whether considering the state of the record, the summary judgment entered on the pleadings and record was justified. We think that it was.

There can be no question but that one of the issues involved in the former hearing was the amount of coal remaining in the mine which could have been mined at a reasonable profit under normal conditions. Much testimony was offered by both sides with reference to this matter; and a definite finding was made by the special master, affirmed by the judge below and by this court, fixing the amount at 2,300,000 tons. With reference to this matter, the judge below said [D.C., 26 F.Supp. 172, 177]:

"The record contains much expert testimony as to conditions in the mine when Stonega discontinued operations, most of which in the view the Court takes of the case is irrelevant. But the Court is of opinion, as was the Special Master, that the weight of such evidence is with the plaintiffs and that the Sun mine was on December 1, 1931, as good as the average mine in the New River field, and capable of profitable operation when the average New River mine could be so operated.

"The minable coal in the Sun mine was far from exhausted. Stonega's witnesses admitted that more than 1,700,000 gross tons of minable coal remain therein, and the Court is of opinion that the Special Master was conservative in his finding that the tonnage remaining is at least 2,300.000 tons. Much of the coal claimed before the Master as unminable was of the same char-

acter as Stonega had been successfully mining and selling for years, was mining at the time of its notice of withdrawal and was planning to continue mining, as shown on a mine map submitted to the plaintiffs about December 1, 1931, by symbols used by engineers to show intended operations and how they would be conducted."

And in his conclusions of law he said:

"According to the weight of the evidence the Sun mine in November, 1931, was as good as the average mine in the New River field and susceptible of profitable operation when the average mine could be profitably operated, it contained at least 2,300,000 tons of minable coal, and had a productive capacity in excess of 30,000 tons per month, which was Mr. Taggart's aim in the report made of the examination of the mine before Stonega took it over.

\* \* \* \* \* \* \* \* \*

"The working conditions in the mine and the condition of its equipment appear to have been substantially the same as in previous years after it had been rehabilitated by Stonega, as evidenced by the fact that the mining cost in 1931 was not excessive as compared with the previous years of Stonega's operations, or any of them. The only disappointment that Stonega suffered or cause for disappointment it encountered was the behavior of the market."

And in affirming the decision below this Court said: "These being the facts as to the condition of the mine and the possibility of the lessee's continuing to operate it at a profit, the interpretation of the withdrawal clause of the lease becomes a matter of minor importance; for even if that clause be construed as coterminous with the leases, it is clear that withdrawal by the defendant under the existing circumstances was not justified. In mineral leases of this character, it is well understood that the lessee takes the risk of fluctuations of the market (Cf. Williams Pocahontas Coal Co. v. Berwind Land Co., 4 Cir., 76 F.2d 319); and it could not have been contemplated that the lessee should have the right to surrender the lease and throw the mine back upon the lessors because of the decline in prices due to an economic depression, which is generally of a temporary character. Only in the event of conditions arising which would prevent the mine being operated at a profit under normal circumstances would withdrawal under the clause be justified; and, as we have seen, no such conditions

had arisen. * * * The question is: Could the lease be worked at a profit? As heretofore shown, any conclusion that it could not be so worked was not justified by the facts, when consideration is given to normal conditions and not merely to the temporary situation resulting from the depression."

And with respect to the provision of the leases requiring operation until all coal should be taken from the leased premises, we said: "When the mine was developed and proved to be one of the most profitable mines in the New River section, the withdrawal clause ceased to have any significance in the lease. And after the fixed period of twenty-one years had expired, the rights of the parties with respect to abandonment and liability for rents and royalties depended upon the provision that the lease was to be extended until all coal should be taken from the leased premises. This, of course, means no more than all coal that could be mined profitably under normal conditions. William C. Atwater & Co. v. Fall River Pocahontas Collieries Co., 119 W.Va. 549, 195 S.E. 99, 102; Flavelle v. Red Jacket Consol. Coal & Coke Co., 82 W.Va. 295, 96 S.E. 600; Big Vein Pocahontas Co. v. Browning, 137 Va. 34, 120 S.E. 247, 253; Hendon v. De Bardeleben Coal Corp., 5 Cir., 30 F.2d 686; Ridgely v. Conewago Iron Co., C.C., 53 F. 988. But as heretofore shown, the mine had not been exhausted of all coal that could be mined profitably under normal conditions; and there was consequently no right of abandonment."

■ A consideration of these passages of our former opinion and the findings of the District Judge quoted therein leaves no doubt that there was an adjudication in the former hearing that 2,300,000 tons of coal remained in the mine and that this coal could be mined profitably under normal conditions. The liability of defendant was based upon these findings, and upon them the abandonment of the mine was held not to be justified. After these matters had been thus adjudicated in the cause, we think that the judge below was entirely correct in refusing to go into them again. The contention that the coal could not be mined at a profit because of the general economic situation and the conditions prevailing in the coal industry had been fully considered in the former hearing and appeal, and the criterion of liability insisted upon by defendant had been definitely rejected. It was not proposed to show any change in the physical condition of the mine. Indeed, as a result of the flooding, any such showing was out of the question, as counsel for defendant quite candidly admitted at the bar of this Court. All that was proposed was to thresh over again the question of the possibility of profitable operation in the light of economic and trade conditions for the year 1932 and succeeding years, notwithstanding our holding that it was the possibility of profitable mining under normal conditions which was determinative. As the court was bound by the findings and determinations theretofore made and affirmed on appeal, judgment was properly entered on the record notwithstanding the effort in the answer to re-litigate these matters.

■ Defendant argues that since the complaint at the time of the former decree asked judgment only for the instalments of rental which had accrued up to the filing of suit, the findings are not binding as to subsequent instalments. A sufficient answer to this is, that a decree in equity may speak as of its date and should completely determine the controversy before the court, and the first decree did completely determine it, granting relief beyond what we thought was justified. The pleadings, of course, could be amended at any stage in the interest of a complete determination. Another and complete answer is that the issue here presented was raised and determined in the former hearing and the action of the court thereon is conclusive and binding upon the parties, and would be binding upon them even if this were another action and a different claim or demand were involved. Tait v. Western Maryland R. Co., 289 U.S. 620, 623, 53 S.Ct. 706, 77 L.Ed. 1405; United States v. Moser, 266 U.S. 236, 45 S.Ct. 66, 69 L.Ed. 262; Southern Pac. R. Co. v. United States, 168 U.S. 1, 48, 18 S. Ct. 18, 42 L.Ed. 355; Cromwell v. County of Sac, 94 U.S. 351, 352, 353, 24 L.Ed. 195; 30 Am.Jur. 920-923. When the finding upon the first hearing was affirmed, it became the law of the case and was binding upon the parties, as well as upon the lower court, and was not subject to re-examination upon the remand. 5 C.J.S., Appeal and Error, § 1964, p. 1499-1502.

Defendant bases an argument upon the use of the word "profitably" in the following language in the concluding paragraph of our opinion, viz.: "It is clear that liabil-

ity should not be imposed for a longer period than that for which the 8 cent per ton royalty upon coal which could be mined profitably would pay such rental". What was meant by the word profitably as used in this quotation becomes clear when consideration is given to what had preceded it in the opinion. It was there made clear that there was liability to continue operations so long as there remained in the mine coal which could be mined profitably "under normal conditions". That we did not use the qualifying phrase "under normal conditions" or repeat that the amount of the coal which could be mined profitably had been found to be 2,300,000 tons, did not mean that we intended that the issue with respect thereto should be tried over, or that a different criterion might be adopted from that which we had approved after careful consideration. We were disapproving the provision of the decree of the lower court which required the payment of minimum rental until all minable coal should be removed. As the mine had been flooded and further working seemed out of the question, the effect of this was to require the payment of the minimum rental in perpetuo. We thought it equitable that a limitation be placed on this and that the minimum rental be limited to the amount which would have been paid for the minable coal if it had been extracted.

Under the strict wording of the leases, defendant was liable for the minimum rental as long as minable coal remained in the mine; and defendant could not avoid payment of this rental merely because mining would not be profitable as a result of economic or trade conditions. Under the peculiar circumstances of the case, however, we thought that justice would be done if plaintiffs were paid by way of minimum rental the amount of the royalty on the minable coal left in the mine, and the modification of the decree directed by our former opinion was intended to accomplish this result. The minable coal had become unminable as a result of the breach of contract by defendant. Our decree required the defendant to pay for it, just as though it had been mined, and allowed the payments to be made on the basis of minimum rental.

The decree appealed from will accordingly be affirmed.

Affirmed.