Roger O. LA BATT and Robert Cook,
Plaintiffs-Appellants,

v.

John J. TWOMEY, Defendant-Appellee.

Rudolph L. LUCIEN,
Plaintiff-Appellant,

v.

Peter B. BENSINGER and John J.
Twomey, Defendants-Appellees.

Holice P. BLACK et al.,
Plaintiffs-Appellants,

v.

John J. TWOMEY, Defendant-Appellee.

Nos. 73–1217, 73–1390 and 73–1391.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1974.

Decided Jan. 8, 1975.

Leslie G. Foschio, Notre Dame, Ind., and Robert Billmeier, Law Student, Frank S. Merritt, Prison Legal Services, Chicago, Ill., for plaintiffs-appellants.

William J. Scott, Atty. Gen., Jayne A. Carr and Brian David, Asst. Attys. Gen., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, PELL and TONE, Circuit Judges.

FAIRCHILD, Chief Judge.

Plaintiffs, all inmates incarcerated in the Illinois State Penitentiary, Joliet–Stateville Branch, appeal from judgments entered in favor of defendant prison officials. The three actions were brought under 42 U.S.C. § 1983, seeking injunctive and monetary relief for alleged violations of plaintiffs' civil rights. The suits all concern a "restricted status" institutional dead-lock imposed at the Stateville Prison on July 2, 1972. Following an altercation of disputed character and magnitude, defendant Warden Twomey placed the entire prison population on restricted status, confining them to their cells. The restriction continued for nine days. This procedure, taken pursuant to § 809 of the Administrative Regulations of the Illinois Department of Corrections,[1] resulted in full 24 hour confinement and attendant restrictions on exercise, association, and normal vocational and educational activity. On July 11, 1972, the restricted status was rescinded and the general inmate population returned to its normal routine. Each appeal presents distinct issues concerning these occurrences.

## I. LUCIEN AND BLACK, ET AL.

These two actions were commenced separately by plaintiffs Rudolph L. Lucien and Holice P. Black and were consolidated in the district court on motion of the defendant.[2] Each of the pro se complaints, fairly read, attacked the institutional dead-lock, claiming that the procedures were invoked without the benefit of procedural due process; that the facts did not justify the measures taken; that the measures were continued arbitrarily; that the conditions resulting from the challenged confinement constituted cruel and unusual punishment; and that defendants violated the equal protection clause through arbitrarily selective enforcement of the dead-lock. In addition, Lucien asserted that defendants had denied him necessary medical treatment during this period; and Black that he and his fellow plaintiffs were discriminatorily excluded from early release from the dead-lock as punishment for expression of First Amendment-protected criticism of prison administration.

The district court, after considering affidavits submitted by defendants and plaintiff Black, and the factual allegations contained within plaintiff Lucien's

---

1. Administrative Regulation # 809 provides in pertinent part:

 "Chief Administrative Officers of Adult Division institutions may, when faced with a clear and immediate threat to the security of the institution or to the safety of its employees or inmates, temporarily confine one, several, or all inmates of the institution pending investigation.

 \* \* \* \* \* \*

 "Following such a lockup or following a serious disturbance which results in a major change in terms of inmates accessibility to programs, the Adult Division's Technical Advisor shall be notified. The Technical Advisor shall then promptly visit by telephone or in person with the Chief Administrative Officer to ensure that proper documentation is available to record the reason for the lockup and the danger and/or threat to security upon which the decision was based."

2. Black was joined by three other named inmate plaintiffs. He sought to bring the action on behalf of all others similarly situated but this question was never reached by the district court.

verified complaint, granted summary judgment to the defendants on every claim presented. On appeal, plaintiffs argue that this grant of summary judgment was erroneous in view of the existence of genuine issues of material fact and the policy considerations against summary judgments in *pro se* prisoner civil rights actions such as the present.

A. *Procedural Due Process.*

We confront, at the outset, the novel issue of the applicability of procedural due process protections to actions allegedly taken in response to extraordinary emergency situations by prison authorities. Both Lucien and Black argue that they were denied due process of law through defendants' imposition of the "restricted status" dead-lock without affording some sort of prior hearing wherein they could be informed of the reasons for the action contemplated and provided reasonable opportunity to speak in their own behalf.

■■■ It is no longer open to argument that, while lawful imprisonment necessarily limits many rights and privileges available to the ordinary citizen, Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), "[t]here is no iron curtain drawn between the Constitution and the prisoners of this country." Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). The question of whether any procedural protections are due depends upon "the extent to which an individual will be 'condemned to suffer grievous loss.'" Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). We have previously held that a prison disciplinary proceeding which inflicts "additional punishment" upon an inmate may be "sufficiently severe, and may represent a sufficiently drastic change from the custodial status theretofore enjoyed, that it must be classified as 'grievous loss.'" United States ex rel. Miller v. Twomey, 479 F.2d 701, 717 (7th Cir. 1973), cert. denied, 414 U.S.

1146, 94 S.Ct. 900, 39 L.Ed.2d 102. See also, Thomas v. Pate, 493 F.2d 151, 161 (7th Cir. 1974), judgment vacated on other grounds, 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39; Adams v. Pate, 445 F.2d 105, 108 (7th Cir. 1971). The deprivations associated with an institutional dead-lock, including twenty-four hour confinement, and curtailment of all association, exercise and normal vocational and educational activity, persuade us that when such status is sufficiently prolonged, such dislocation of the prisoner's normal condition constitutes a "grievous loss," as is true of the "segregated confinement" dealt with in *Miller* and *Thomas*.[3]

■■ Determining that a sufficiently prolonged institutional dead-lock requires procedural protection under the due process clause does not, however, establish the *nature* of the protection required. The due process clause provides an elastic, flexible standard which varies with the attendant circumstances. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961). In situations such as the present, where prison authorities are allegedly reacting to emergency situations in an effort to preserve the safety and integrity of the institution, the state's interest in decisive action clearly outweighs the inmates' interest in a prior procedural safeguard. "[T]he possibility of widespread violence is a continuous condition of prison life. A good faith determination that immediate action is necessary to forestall a riot outweighs the interest in accurate determination of individual culpability before taking precautionary steps." United States ex rel. Miller v. Twomey, *supra,* 479 F.2d at 717. See

---

3. See also, Gray v. Creamer, 465 F.2d 179, 185 (3rd Cir. 1972); Sostre v. McGinnis, 442 F.2d 178, 198 (2nd Cir. 1971), cert. denied,

404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740; Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

also, Gomes v. Travisono, 490 F.2d 1209, 1215 (1st Cir. 1973).

■ While it has been suggested that, at a minimum, due process requires an opportunity for some kind of hearing *before* a person is deprived of a protected interest, *cf.* Sniadach v. Family Finance Corp., 393 U.S. 337, 342, 89 S.Ct. 1820, 23 L.Ed.2d 349 (Harlan, J., concurring), there exists a clear exception in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). We find that a good faith response to apprehended emergency conditions within a prison clearly falls within the ambit of this exception.

■■ Accordingly, where a sufficiently extended deprivation of prisoners' rights occurs, notice of the cause of the deprivation, the reasons for its continuance, and an opportunity to respond must be provided within a reasonable period of time *after* the emergency decision has been effectuated and while its extraordinary effects continue.[4] See, Gray v. Creamer, *supra,* 465 F.2d at 185, note 6. "In cases . . . for which the punishment is severe, after the immediate crisis is past, the relative importance of the inmate's interest in a fair evaluation of the facts increases and the state's interest in summary disposition lessens; indeed, in such cases, in the long run the state's interest in a just result is the same as the individual's. For in those cases neither the state nor the inmate has any valid interest in treating the innocent as though he were guilty." United States ex rel. Miller v. Twomey,

*supra,* 479 F.2d at 717–718. This procedure enables prison authorities to take emergency action unfettered by any requirement of providing an entire prison population with a prior hearing. However, when these actions extend over a sufficiently prolonged period of time, those inmates confined by the institutional dead-lock must be granted an opportunity to vindicate their right to be informed of the reasons justifying their continuing state of confinement and afforded a reasonable opportunity to respond thereto.[5]

■ The deprivation caused by defendants' imposition of the dead-lock in the present case extended over a period of nine days. Plaintiffs allege that, while numerous attempts were made to communicate with defendants during the dead-lock, no response was ever received and, further, that they were never informed as to its nature and cause. The district court, in granting summary judgment to the defendants, concluded that the dislocation of the prisoners' normal status engendered by this procedure was not sufficiently severe to require provision of adequate notice and opportunity to respond. Necessarily, the determination of when emergency action, by its severity or prolongation, reaches a point requiring due process protection must be made on a case-by-case analysis of the diverse and unique factual situations presented. Accordingly, while we cannot with particularity establish uniform standards for all such future emergency actions, we conclude that conditions, no more severe than those disclosed by the present record, invoked pursuant to administrative procedure requiring immediate notification of appro-

4. "If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him [citations omitted] and afforded a reasonable opportunity to explain his actions." Sostre v. McGinnis, *supra,* 442 F.2d at 198.

5. This result is consistent with those cases considering the due process limitations on prison officials' power to transfer inmates to other institutions, which have concluded that transfers accorded during emergencies are not entitled to a prior hearing; but that due process protections are required at a reasonably prompt time after the transfer has been effectuated. See, *e. g.,* Gomes v. Travisono, 490 F.2d 1209, 1215 (1st Cir. 1973); Hoitt v. Vitek, 361 F.Supp. 1238, 1253 (D.N.H.1973), aff'd 497 F.2d 598 (1st Cir. 1974).

priate state authorities and contemporaneous documentation of the perceived conditions justifying the action, and prolonged no more than nine days do not require the provision of the protections set forth above.[6] The order of the district court granting summary judgment to defendants on this issue is therefore affirmed.

### B. *Lack of Basis Justifying the Emergency Decision.*

As a corollary to their procedural due process allegations, plaintiffs charge that the defendants' decision to impose the institutional dead-lock was arbitrary and capricious, and so lacking in rational justification as to amount to a denial of due process and equal protection. In support of these allegations, plaintiffs have, in Lucien's verified complaint and through affidavits submitted in opposition to defendant's motion to dismiss or for summary judgment, described the occurrences at the prison on July 2, 1972 in detail and, in effect, challenged the emergency justification asserted by defendants.[7]

 At the threshold, we are faced with the question as to the reviewability of decisions such as these. As we have noted, the questions cut to the heart of effective and safe penal administration. Prison officials reacting in good faith to perceived emergency situations must not be unduly hindered by overbroad federal judicial scrutiny, on the basis of hindsight, of the factual basis underlying their actions. "We recognize that present or impending disturbances which might overtax the control capacity of a prison creates a dominant interest in prison authorities being able to act with-

out delay if they feel that delay would endanger the inmate, others, or the prison community. [Citation omitted.] This is so even though the assessment of difficulties may subsequently prove to be unfounded . . . " Gomes v. Travisono, *supra,* 490 F.2d at 1215. The psychology and social stability of a prison community are foreign to one who is not involved with it on a day-to-day basis. Any attempt to reconstruct, at a later date, the conditions present at the time of dispute, and the dangers then feared by prison authorities, is fraught with perils of misunderstanding and misapprehension.

 Accordingly, the standard of review of a challenge to the sufficiency of the basis for emergency response must be generous to the administration. We conclude that, absent a claim of bad faith or mere pretext on the part of prison authorities in the imposition of emergency procedures, the underlying basis of decision must be deemed to lie fully within their expertise and discretion and, accordingly, is insulated from subsequent judicial review. Hoitt v. Vitek, 497 F.2d 598, 600 (1st Cir. 1974). A liberal reading of the complaints before us reveals no allegations of bad faith in the determination of the warden that prison conditions required the imposition of the dead-lock. The affidavits submitted do reveal conflicts of fact concerning the nature and seriousness of prisoner misconduct and threat of disorder, but do not indicate the existence of any genuine issue of bad faith. Thus the district court's grant of summary judgment to defendants on this issue was proper.

---

6. We recognize the uncertainty produced by lack of specific standards. We must recognize, however, the diversity of emergency situations which may occur within correctional institutions. In deciding when such due process protections as notice and an opportunity to respond are required, the considerations must be the severity of the action and the concomitant interference with normal prison life; the length of its imposition; and the reasonable availability of opportunity to provide meaningful individual notice. Essential-

ly, as the emergency reaction is extended in time, the dislocation of normal prison activity is magnified, the reasonable opportunity to provide adequate notice increases, and the requirement of due process protections becomes compelling.

7. Plaintiffs do not challenge the good faith of defendants in imposing the dead-lock (*i. e.,* allege pretextual action) but rather dispute the basis for the decision and its continuation.

We note, however, that emergency institutional actions of this type frequently extend over a period of time. The dead-lock in issue here continued for nine days. A recent similar occurrence in New Hampshire lasted up to two months. Hoitt v. Vitek, *supra,* at 599. We agree with that court that " '[e]mergencies, however, cease to be emergencies when they continue indefinitely and inmates cannot be kept confined to their cells indefinitely in alleged violation of their constitutional rights merely on the assertion of the Warden that prison security requires it.' " *Id.* at 600. Discretion of prison authorities in this area is not wholly immune from judicial review. A complaint, seeking injunctive relief, states a cause of action when it sufficiently alleges "an extensive and unreasonable continuation of a lockup after the termination of emergency." *Id.* Similarly, an action for damages will survive a motion to dismiss if such allegations are combined with an assertion that the emergency actions were continued in bad faith, through excessive and unreasonable neglect, or arbitrarily. *Id.*

A fair reading of the complaints before us indicates that plaintiffs are attacking the continuation of the deadlock during its nine day duration. The complained of conduct, however, has long since ceased and, thus, only plaintiffs' action for damages is before the court. We do not find the requisite allegations of bad faith, excessive neglect or arbitrary action. The district court's grant of summary judgment to defendants on this issue is therefore affirmed.

### C. Cruel and Unusual Punishment.

Both Lucien and Black allege that conditions resulting from the institutional dead-lock were of such a limiting and destructive nature as to constitute cruel and unusual punishment. In support of this charge, it is stated that the dead-lock resulted in a reduction in food; feeding in unsanitary conditions; elimination of showers; curtailment in changes of clothing; denial of soap and toothpaste; a limitation of sick call services; denial of educational and vocational rehabilitation programs; and a general deterioration of sanitary conditions within the cells in which the prison population was confined.

In order to establish a violation of the Eighth Amendment, plaintiffs must either show that the actions of the defendant intentionally inflicted excessive or grossly severe punishment upon them or that conditions so harsh as to shock the general conscience were knowingly maintained. Thomas v. Pate, *supra,* 493 F.2d at 159–160; Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968). In the present action, plaintiffs complain of the nature and extent of defendants' response to a perceived emergency condition. As such, the essence of their complaint is subsumed within their due process attack upon the sufficiency of the basis for the imposition of the dead-lock and of the necessity for its continuance. Moreover, we note that response to emergency situations in a prison environment necessarily entails curtailment of rights and privileges of the inmate population. While conditions such as those alleged by plaintiffs might well at some point reach the dimension of shocking the nation's collective conscience, we believe that their nine day imposition in the present case did not.

Accordingly, we conclude that the district court properly granted summary judgment to defendants on this issue.

### D. Selective Enforcement and Denial of Equal Protection.

Lucien, in his verified complaint, alleges that defendants, through arbitrary and selective enforcement of the institutional dead-lock, violated his constitutional right to equal protection of the law. Specifically, he states that a number of inmates were released from restrictive status during the dead-lock while he was arbitrarily denied similar privileges. Defendants, in their motion to dismiss or for summary judgment, submitted an affidavit from Superintendent Revis stating that the selective release complained of was effectuated

for the sole purpose of maintaining critical services and functions of the institution.

 In arguing against the district court's order of summary judgment for defendants on this issue, Lucien relies upon affidavits submitted to the court below which purport to identify certain inmates who were released and whose job assignments and duties were alleged to be nonvital and of a similar nature to those of plaintiffs. The equal protection clause does not take from the state the power to make classifications for a reasonable purpose which do not create invidious discrimination or invade some fundamental interest. Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); Schilb v. Kuebel, 404 U.S. 357, 364–365, 92 S.Ct. 479, 30 L.Ed.2d 502 (1971). The affidavits are insufficient to establish any arbitrary or unreasonable classification by defendants. As the district court noted, "there is nothing irregular or unconstitutional about [defendants'] decision to release certain inmates who did not present a threat to the interest he sought to protect."

 Black makes a similar claim of arbitrary selective release but supplements it with an allegation that he and his fellow plaintiffs were discriminatorily "excluded from the selective process . . . because the plaintiffs have exercised their First Amendment right to criticize the defendant Warden and his prison administration." Considering this complex of allegations, it is clear that the affidavits before the district court raise the issue of whether prisoners similarly situated to plaintiffs, except for First Amendment related activity, have been treated more favorably in the granting of early release from the dead-lock. On remand, the district court must further consider defendants' justification for their actions of selective release. If defendants are to prevail the court must determine that some valid and proper

reason existed for differentiation between Black and his fellow plaintiffs and those released.

We conclude that the district court's order of summary judgment for defendant on the equal protection claim in Lucien's complaint was proper; but that the similar grant in the Black action must be reversed and remanded for additional proceedings.

E. *Lucien's Claim of Denial of Medical Treatment.*

Plaintiff Lucien alleges that, during the nine day period of the institutional dead-lock, he was denied medical treatment for a previously identified condition of food allergy. In response, defendants have submitted affidavits which state that the prison's general hospital records indicate that 253 unidentified prisoners received treatment by the medical staff; that Henry Schroll, a prison Medical Technician, witnessed certain unidentified prisoners being escorted to the hospital for treatment; and that Lucien's medical history indicates that he had informed the medical staff at the hospital of his claimed allergy prior to the dead-lock; that attempts to confirm it were unavailing; and that certain medication was prescribed for him both prior and subsequent to the dates at issue.

 Construing the allegations contained in Lucien's complaint liberally, he states a cause of action, as set forth in Thomas v. Pate, *supra,* 493 F.2d at 157–159, for refusal to provide essential medical care. Considering all of the evidence presented, it was error for the district court to grant summary judgment to defendants on this cause of action. There remain for resolution clear disputes over material questions of fact concerning whether defendants knew of Lucien's claimed health difficulties suffered during the dead-lock; and whether medical treatment was available and provided to him as generally claimed in defendants' affidavits.[8]

---

8. We do not understand defendants' position to be that the alleged emergency conditions present within the prison justified the denial, but rather that there was, in fact no denial and that the care provided inmates during the dead-lock period was sufficient and proper.

■ This result is especially proper in a case such as the present. We have previously noted the serious question as to whether the summary judgment procedure should ever be employed against an incarcerated party. Bracey v. Herringa, 466 F.2d 702, 703 (7th Cir. 1972). While it does provide a relatively prompt means of disposing of a class of lawsuits whose present proliferation in the federal courts has raised concern over problems of effective judicial administration, Morales v. Schmidt, 494 F.2d 85 (7th Cir. 1974) (*en banc,*) an overriding interest must be fairness to the parties, especially where important constitutional rights are asserted. Incarcerated prisoners, proceeding *pro se,* are bound and limited by often rigorous prison security regulations which restrict access to prison officials, guards, other prisoners, and outside nonprison personnel. Here, Lucien submitted an unverified reply to the summary judgment motion, in which he made several material offers of proof and stated that the strenuous security system within the prison prevented him from securing affidavits. Under such circumstances, the court should be especially cautious in granting summary judgment. See, *e. g.,* Harris v. Pate, 440 F.2d 315, 318 (7th Cir. 1971).

Accordingly, we conclude that the grant of summary judgment to defendants on Lucien's claim of denial of necessary medical care must be reversed.

## II. LA BATT AND COOK

Plaintiffs LaBatt and Cook commenced their action July 17, 1972. This *pro se* complaint, fairly read, alleged that defendant Twomey's manner of instituting and conducting the Stateville dead-lock violated plaintiffs' due process and equal protection rights and that certain conditions of such confinement constituted cruel and unusual punishment. One specific allegation challenged defendants' alleged refusal to provide medical treatment during this period for LaBatt's condition of epilepsy and Cook's condition of chronic asthma. On October 12, 1972, defendant filed a motion to dismiss or for summary judgment, accompanied with numerous supporting affidavits.

Four days later, on October 16, 1972, plaintiffs filed an inartistically drawn collection of applications which included a motion for leave to file an amended complaint. These applications, though docketed, were never addressed by the district court. On November 30, 1972, plaintiffs filed a second collection of documents which included an "Application for Joinder of Persons Needed for Just Adjudication" and an amended complaint which sought to add three party defendants and withdraw from consideration all issues except the denial of necessary medical treatment. This claim was amplified and elaborated with detailed factual allegations.

On December 18, 1972, the district court granted defendants' motion for summary judgment. Three days after entry of this order, defendant filed a response to plaintiffs' amended complaint in which he sought dismissal or summary judgment and attached two additional affidavits in support. Plaintiffs did not respond to this motion, but rather filed a timely notice of appeal.

■ The decision and order appealed from below was clearly predicated upon the issues raised in plaintiffs' original complaint. It discussed at length the due process and equal protection claims abandoned in the amended pleading and failed to discuss or consider the detailed factual allegations concerning denial of requested medical treatment contained therein. Failure to consider the amended complaint was error. Under Rule 15(a), F.R.Civ.P., "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served . . . ." Defendant did not file an answer to the original pleadings,

We therefore do not address the issue as to what effect an emergency situation might have on a conceded failure to provide necessary medical treatment. We do note, however, that emergency conditions might be such as to justify a temporary failure to provide medication or treatment for minor ailments.

but rather asserted a motion to dismiss or for summary judgment. In this circuit, a motion to dismiss does not constitute such a responsive pleading. Fuhrer v. Fuhrer, 292 F.2d 140 (7th Cir. 1961); Thomas v. Pate, *supra,* 493 F.2d at 162. Similarly, the weight of authority indicates that a motion for summary judgment is not a responsive pleading. Rogers v. Girard Trust Co., 159 F.2d 239, 241 (6th Cir. 1947); 3 Moore, Federal Practice, ¶ 15.07 [2]. Accordingly, plaintiffs had the right to amend their pleading without leave, and the allegations of the amended complaint superseded those of the original complaint filed in this case.[9]

Plaintiffs' amended complaint was verified and raised substantial issues of fact concerning defendants' alleged failure to provide medical treatment. The facts therein alleged set forth an actionable claim under the Fourteenth Amendment and § 1983. Thomas v. Pate, *supra,* 493 F.2d at 158. The affidavits filed in conjunction with defendant's October 12 motion to dismiss or for summary judgment, the only evidence the district court had before it controverting this claim at the time it issued its order, primarily dealt with the justification for and the conditions present during the July deadlock. The only evidence concerning the denial of medical treatment claim before the court consisted of general and conclusory assertions that unspecified medical services were provided to certain unidentified prisoners during the period in question. Such allegations are manifestly insufficient to provide a valid basis for summary judgment.

 Defendant, apparently conceding the inadequate basis for the trial court's order of summary judgment, seeks affirmance by directing our attention to affidavits submitted to that court subsequent to its judgment and submitted to this court as an attachment to its brief, arguing that they dispose of any genuine issue of fact presented in the amended complaint. Defendant, in effect, asks us to find that plaintiffs have foregone their right to file responsive affidavits on the question. This we cannot do in the present circumstances where plaintiffs really had no meaningful opportunity to contest the subsequent affidavits.[10]

Accordingly, judgment for defendant will be reversed as to this issue.

## III. CONCLUSION

In No. 73–1217, judgment for defendants on LaBatt and Cook's claim of denial of necessary medical care is reversed and the cause is remanded for further proceedings consistent with Part II of this opinion. In Nos. 73–1390 and 1391, the judgment for defendants on Black's equal protection claim, and on Lucien's claim of denial of necessary medical care, as discussed in Parts I (D) and (E) of this opinion is reversed and the cause remanded for further consideration. In all other respects the judgments are affirmed.

---

**9.** It appears that the district court overlooked plaintiffs' application to add parties defendant. This may be considered on remand with the proviso that parties are to be granted leave to amend freely, especially, absent any showing of prejudice to the defendant, F.R. Civ.P. 15(a); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Moreover, it is clear that, while the amended complaint could not, as a matter of course, add new parties defendant, this does not destroy the effect of the amended complaint as an amendment as of right as to the defendant Twomey. Cf. Goldlawr, Incorporated v. Shubert, 169 F.Supp. 677, 689 (E.D.Pa.1958), aff'd 276 F.2d 613 (3rd Cir. 1960).

**10.** Moreover, we note that an examination of the defendant's proffered affidavits and the facts alleged in the plaintiffs' amended verified complaint reveal important issues of fact outstanding. As to LaBatt's claim, defendant submitted by affidavit that he "*should* have had enough medication" for the period in question. Actual delivery to LaBatt of the drugs, however, is not established and is, clearly, critical to any claim of denial of medical services. The supplemental affidavit concerning Cook's claim is similarly insufficient to foreclose his claim. It reports that the pharmacy record "lists tedral prescribed in *June 29* for *seven* days. On July 11, 1972, tedral was prescribed for thirty days." (Emphasis added.) These assertions leave in question the adequacy of medication for the period July 6 through July 11.