Anthony CARLO et al.,
Plaintiffs-Appellants,

v.

Frank O. GUNTER et al.,
Defendants-Appellees.

No. 75–1163.

United States Court of Appeals,
First Circuit.

Argued June 4, 1975.

Decided Aug. 4, 1975.

---

Before COFFIN, Chief Judge, McEN-TEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

On December 31, 1974, defendant Gunter was appointed Superintendent of MCI Walpole, the commonwealth's maximum security institution which for some years has been a scene of virtually continuous disruption.[1] His appointment followed by five days the murder of an inmate, the discovery of a cache of guns and ammunition and the consequent beginning of a lockup of the entire institution. In order to end the lockup and resume normal operations Gunter determined to survey the population and segregate potentially dangerous and disruptive inmates in the B wing. Inmates were notified on January 9 that they would be meeting with classification committees to review their current classification status and program needs in relation to their placement within the prison.[2] At the brief committee hearings inmates had no opportunity to hear or challenge adverse comments by committee members or record notations, which were discussed out of their presence. In making the actual housing assignments, defendants relied on personal knowledge and the inmates' reputations as well as the survey reports prepared by the five classification committees. Gunter reviewed these reports after the assignments had been made, endorsing the notation "WC" (for "wrecking

Richard E. Shapiro, Boston, Mass., with whom Timothy J. Wilton, Prisoners Rights Project, was on brief for plaintiffs-appellants.

Michael C. Donahue, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and John J. Irwin, Jr., Asst. Atty. Gen., Chief, Crim. Bureau were on brief, for defendants-appellees.

1. During 1974 the Norfolk County Grand Jury returned 48 indictments for assaults within the institution. There was a murder (fifteen during the past three years), five attempted murders, two suicides, one major disturbance, and a strike of correctional officers.

2. The court below found:

"Five committees were formed for the purpose of carrying out the survey. The chairman of each committee was either a treatment director or chief social worker from another institution. The other members were one correction officer and one social worker, both from the Walpole staff. In general, the appointments were made so that the correction officer would have had personal knowledge of the inmates who were assigned to that particular committee. The function of the committee was to review the institutional file of each inmate, interview him and fill out a survey report for each inmate. The completed questionnaires were then reviewed by a committee consisting of [Deputy Superintendent] Berman and Deputy Superintendents Butterworth and Waitkevich, who then designated the general housing classification for each inmate with an 'A' or 'B' endorsed on the top of the report."

crew") on the reports of those inmates thought by Butterworth and Waitkevich to be consistently involved in fomenting violence and disruption within the institution. On January 20 the new housing assignments were released and inmates were to be moved. Many forcibly resisted their transfers and caused extensive property damage. Plaintiffs were those taken to Block B–8, where near riot conditions prevailed for two and a half weeks until February 6.

Meanwhile, plaintiffs had filed suit on January 27 alleging the transfers deprived them of due process and seeking monetary and injunctive relief under 42 U.S.C. § 1983. Their motion for a temporary restraining order was denied, and after a trial beginning on February 10 their complaints were dismissed on April 29. The court found that defendants correctly perceived the situation at Walpole as an emergency, requiring the immediate reorganization of the entire institution. It found that the procedures employed in making the reassignments contravened defendants' regulations and were seriously deficient, but that defendants had intended in good faith to devise an emergency plan for housing reassignment consistent with their estimate of the need for a speedy resolution of the crisis at Walpole, and that the shortcomings were excusable in the circumstances.

We turn to the now-familiar two-step inquiry: did the transfers cause plaintiffs grievous loss? If so, what procedures does due process require, balancing the state's interest against those of the prisoner? *Gomes v. Travisono,* 490 F.2d 1209, 1214 (1st Cir. 1973), *vacated and remanded,* 418 U.S. 908, 94 S.Ct. 3202, 41 L.Ed.2d 1156, *on reconsideration,* 510 F.2d 537 (1974); *Palmigiano v. Baxter,* 487 F.2d 1280, 1285 (1st Cir. 1973), *vacated and remanded,* 418 U.S. 908, 95 S.Ct. 2414, 44 L.Ed.2d 678, *on reconsideration,* 510 F.2d 534 (1974). The district court found that the conditions of confinement contemplated in the future for B wing were more stringent than those which plaintiffs had previously enjoyed.[3] We concur in its implicit conclusion that the transfers would result in a "major change in the conditions of confinement," *see Wolff v. McDonnell,* 418 U.S. 539, 571 n. 19, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 1039, a serious deprivation requiring at least a minimal level of due process protection. *Fano v. Meachum,* 520 F.2d 374 (1st Cir. 1975); *Gomes v. Travisono, supra,* 510 F.2d at 539; *Palmigiano v. Baxter, supra,* 487 F.2d at 484–85. The fact that the reassignment was denominated an administrative reclassification rather than a punitive transfer is of no moment where the impact on the inmate is the same. *Fano v. Meachum, supra* at n. 2; *Gomes v. Travisono, supra,* 510 F.2d at 541.

---

3. The court found:

"[T]he contemplated level of security in the 'B' wing, even assuming the most favorable projection described by Superintendent Gunter, is more stringent than it is in 'Block A,' or than it was in 'Block B' before the lock-up of December 26, 1974. In general, inmates assigned to the 'B' wing of the institution will not have the freedom of the institution nor will they mingle with the inmates of the 'A' wing. Meals will be served in the blocks and various rehabilitation and recreational programs will be offered in special areas in the 'B' section rather than in the school, library, shop and other specialized areas available to inmates of the 'A' block. Visiting privileges are fewer, more circumscribed as to number of visitors and subject to prior approval by the administrative officers of the prison. The cells, recreational areas, eating facilities and visiting areas are less desirable than those available to inmates in the 'A' section. There is no privacy in the cells. An inmate assigned to the 'B' section is less likely to be considered for transfer to a medium security institution, for furloughs and for parole, than an inmate assigned to the 'A' section."

At issue is not a simple loss of privileges but a significant modification of the overall conditions of confinement. *See, e. g., Fano v. Meachum,* 520 F.2d 374 (1st Cir. 1975) (stricter security, fewer rehabilitative programs, furloughs more difficult to obtain); *Gomes v. Travisono, supra* (restrictions on visitation, breaking off of established programs, orientation to a new setting, adverse impact on prison record); *Palmigiano v. Baxter, supra.*

Nor is it determinative that the transfer occurred within a single institution. We attached little importance to a one-mile geographical dislocation in holding in *Fano v. Meachum, supra,* that transfer to conditions substantially more adverse constituted a grievous loss. *See Palmigiano v. Baxter, supra.*

The court found the procedure employed violated defendants' own regulations and was seriously deficient in not affording plaintiffs an opportunity to rebut or explain adverse aspects of their records or unfavorable comments by prison staff.[4] The court found, however, that defendants correctly perceived the situation at Walpole as an emergency requiring the immediate reorganization of the entire institution. In these circumstances, it concluded, defendants were justified in dispensing with normal due process requirements and deviating from even the emergency procedure embodied in their own regulations because they were inadequate to the circumstances.[5]

■ The record supports these findings.[6] However, the passage of time may have altered the complexion of things and the court's judgment of dismissal makes no provision for this. A decree in equity may speak as of its date. *Stonega Coke & Coal Co. v. Price,* 116 F.2d 618, 621 (4th Cir. 1941). The court found that the near-riot conditions

---

**4.** Defendants contend that affording plaintiffs a hearing would be a vacuous gesture inasmuch as there are no controverted issues of fact to be resolved. The provision for a hearing in defendants' own reclassification regulations belies this contention, and the cases unanimously mandate that such a hearing be granted even in proceedings not triggered by any specific acts of misconduct but based on general assessments of the inmate's record. *See Gomes v. Travisono, supra* at 541. *See also Catalano v. United States,* 383 F.Supp. 346 (D.Conn.1974); *Robbins v. Kleindienst,* 383 F.Supp. 239 (D.D.C.1974); *Clonce v. Richardson,* 379 F.Supp. 338 (W.D.Mo.1974); *Cousins v. Oliver,* 369 F.Supp. 553 (E.D.Va. 1974). This is not a case where plaintiffs were transferred for reasons extrinsic to their behavior. *See United States ex rel. Haymes v. Montanye,* 505 F.2d 977, 980 (2d Cir. 1974). Nor would the hearing impinge on defendants' discretion to act on the facts as found. *See Morrissey v. Brewer,* 408 U.S. 471, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *see also Gomes v. Travisono, supra* at 541. We recognize that "[a]dministrative realities may sometimes necessitate the flexibility to transfer even on the basis of demonstrably inadequate information," *Fano v. Meachum, supra* (Campbell, J., dissenting), including hearsay and rumor. But insofar as the classification decision rests on factual predicates we think an inmate is entitled in normal circumstances to the opportunity to present his side of the story to insure that the administrators' opinions are based on accurate and reliable facts. *Sostre v. McGinnis,* 442 F.2d 178, 198 (2d Cir. 1971).

**5.** Defendants' regulations, D.O. 4400.2 § 4.2a(2), prescribe that in emergencies inmates undergoing reclassification may be placed in "awaiting action status" pending the reclassification, but do not permit reclassifica-

tion without the normal panoply of procedural protections elsewhere established by the regulations. Such a failure to follow established procedure, plaintiffs contend, itself violates due process. *See King v. Higgins,* 370 F.Supp. 1023 (D.Mass.), *aff'd,* 495 F.2d 815 (1st Cir. 1974). *See also United States v. Griglio,* 467 F.2d 572, 575 (1st Cir. 1972). Defendants represent that the regulations in question had not yet been promulgated under the commonwealth's Administrative Procedure Act and hence were not binding. At any rate, we have elsewhere indicated that prison officials may be justified in ignoring even emergency regulations if they are unworkable in the circumstances. *Morris v. Travisono,* 509 F.2d 1358, 1360–61 (1st Cir. 1975). We accept the district court's finding that defendants intended in good faith to devise an emergency plan conforming as closely to their regulations as possible consistent with their estimate of the need for a speedy resolution of the crisis situation at Walpole.

**6.** Plaintiffs question the existence of an emergency during the period when the reclassification occurred, observing that the record shows no incidents from the beginning of the lockup on December 26 until the beginning of the transfers on January 20. However, prison officials reacting in good faith to perceived emergency situations must not be unduly hindered by overbroad federal judicial scrutiny, on the basis of hindsight, of the factual basis underlying their actions. *Gomes v. Travisono, supra,* 490 F.2d at 1215; *Hoitt v. Vitek,* 497 F.2d 598 at 600 (1st Cir. 1974); *La Batt v. Twomey,* 513 F.2d 641 at 647 (7th Cir. 1975). In light of prior and subsequent events at Walpole we cannot say that the absence of incidents during a period when the entire prison was locked up demonstrates conclusively that emergency conditions did not then prevail.

in Block B–8 had abated by February 6, nearly three months before it dismissed the complaint. Several more months have passed during which plaintiffs have continued to undergo the more adverse conditions of confinement, and the date of their next classification hearing under prison regulations is indeterminate.[7] It is clear that while an emergency may justify *postponement* of due process as the court found, the minimal procedures must be granted at the earliest practicable opportunity thereafter. *See La Batt v. Twomey,* 513 F.2d 641, 645–46 (7th Cir. 1975); *Gomes v. Travisono, supra* at 539; *Morris v. Travisono,* 509 F.2d 1358, 1360 (1st Cir. 1974); *Hoitt v. Vitek,* 497 F.2d 598, 600 (1st Cir. 1974). "The unreviewable discretion of prison authorities in what they deem to be an emergency is not open-ended or time unlimited," *id.* Plaintiffs' misconduct after their transfer does not absolve defendants of their duty to afford them a hearing on the ground that the result would be a foregone conclusion, see *Cousins v. Oliver, supra* at 557, nor does it forever disentitle plaintiffs from the protection of due process under the clean hands doctrine, see *Braxton v. Carlson,* 340 F.Supp. 999, 1000–01 (M.D.Pa.1972), now that they have desisted, though of course it is a factor to be taken into account at subsequent disciplinary or classification hearings. This would seem especially true where the court found that there was violence and provocation by officers as well as inmates, and where it was unable to determine from the evidence which

plaintiffs participated and to what extent. Nor would the fact that a wholesale reorganization of the prison was contemplated completely absolve defendants from the requirement of affording plaintiffs hearings, *see Bowers v. Smith,* 353 F.Supp. 1339 (D.Vt.1972),[8] though we agree with the district court that it could properly affect their timing.

■ While some process may therefore yet be due, the very magnitude of the emergency move and the probable continuance of a sensitive situation dictate a wide degree of discretion on the part of the district court on remand. As the court observed, the reclassification program is a continuing one. Presumably some plaintiffs have already been given the hearing. Others may be scheduled for hearing[9] in the near future. If it appears that there are some as to whom no such hearings are contemplated within a reasonable time, and no sufficient justification for such delay exists, the court will have the authority to deal with these cases. Where the hearings do not result in a determination that a reasonable basis existed for including an inmate in the mass transfer, the authorities should expunge the fact of transfer from that plaintiff's record or at least include a notation that the determination had been made under emergency conditions not comporting with due process so that there should remain no continuing adverse impact by reason of the transfer on plaintiff's opportunities for transfers, furloughs, or

---

**7.** The Department of Correction regulations do not set the frequency of classification review but leave it to the individual prison to establish a review policy. The frequency is to depend at least in part on the discretion of administrators in individual cases. Some of plaintiffs' survey reports suggested review as soon as possible; others in January 1976; still others contained no recommendation at all. *Cf. La Batt v. Twomey,* 513 F.2d 641 (7th Cir. 1975) (emergency lockup of not more than nine days' duration not a grievous loss requiring a hearing); *Kessier v. Cupp,* 372 F.Supp. 76 (D.Or.1973) (thirty days).

**8.** A total of 101 inmates out of a population of 570 were shifted into the more adverse condi-

tions of B wing. The burden of affording them a classification hearing would not seem insurmountable considering that classification is an on-going process anyway as the court found.

**9.** Since "[t]he primary responsibility for articulating standards of due process lies with those who have the most intimate knowledge of both the interests of the prisoners and the administrative burdens entailed with providing due process within [a] prison," *Palmigiano v. Baxter, supra* at 1286, we deem it appropriate that such hearings, if ordered, conform to the procedures mandated by defendants' own classification regulations.

parole. *See Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 44 L.Ed.2d 272 (1975); *Chapman v. Kleindienst,* 507 F.2d 1246, 1248–49 n. 2 (7th Cir. 1974). We contemplate that whatever needs to be done in light of this opinion will be done administratively on the initiative of defendants. The court, however, if not satisfied that timely and adequate proceedings are being undertaken, will have the ability to do what seems necessary.

*Vacated and remanded.*