Theron MAXTON, Plaintiff,

v.

Johnnie E. JOHNSON, Laurie Bessinger, Defendants.

Civ. A. No. 79-1747-5.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 17, 1980.

---

Theron Maxton, pro se.

Emmet H. Clair, Columbia, S. C., for defendants.

## ORDER

HEMPHILL, Chief Judge.

This civil rights action, based on 42 U.S.C. § 1983, has been brought by a state prisoner who is in maximum security classification against the Warden and the Chief Correctional Officer of the Maximum Security Center (MSC) of the South Carolina Department of Corrections (SCDC). The case is before the court on the motion of the defendants for summary judgment, supported by affidavits. The plaintiff has received an explanation of summary judgment procedure, and he has filed his own affidavit to oppose the motion.

 In his complaint, the plaintiff alleges that he was confined on lockup for five days in the "hole" at MSC because he threw a cup of coffee through his barred cell door at another prison inmate who was taunting him. The plaintiff describes the other inmate as a friend, but he is complaining because his friend was not also locked up because of the incident. The plaintiff alleges that he was not allowed to take a shower during the time he was locked up, and he contends that he missed a number of meals because of being confined in MSC in an area away from the cell he was occupying before he was locked up. He alleges that these deprivations represented cruel and unusual punishment. The relief requested, in addition to damages for the alleged wrongs, is a transfer to a prison in either Greenville or Spartanburg,[1] or the

---

1. Prior cases filed by Maxton reveal that he is confined in MSC because an institutional adjustment committee sentenced him to confinement in MSC because of his participation in the gang rape of another inmate in Spartanburg while Maxton was there to appear for his post-conviction case. *Maxton v. Rollin*, C/A 77–1592, and *Maxton v. Martin*, C/A 77–1593, dismissed December 29, 1977. Quite apart from the fact that Maxton is in MSC as punishment

removal of both defendants from their present duty assignments to duty in some other prison unit of SCDC.[2]

The defendants have filed their own affidavits, and an affidavit by Assistant MSC Correctional Supervisor James H. Taylor, to depict their version of the circumstances of the lockup of the plaintiff on June 20, 1979, and his confinement in administrative separation from other MSC inmates until June 25, 1979.

Taylor apparently is the only one of the three affiants who actually witnessed the coffee-throwing incident. Taylor recalls that the plaintiff earlier on that day had repeatedly asked inmate Jerry Caldwell to bring him either some coffee or some hot water. Taylor later saw coffee thrown out of the plaintiff's cell at Caldwell, and he avers that Chief Johnson thereafter directed that the plaintiff be sent to administrative separation at MSC.

Johnson states that he initially ordered Caldwell locked up after the coffee-throwing incident, but he released Caldwell after he learned that he had not instigated the disruptive act by the plaintiff. Johnson concedes that he then ordered that the plaintiff be placed in the separation area at MSC "because smooth institutional operations demand isolation of a disruptive inmate." Johnson adds that the plaintiff was not locked up to punish him.

Warden Bessinger confirms that the plaintiff was locked up on Johnson's orders, and Bessinger makes it clear that he ratified Johnson's action. Bessinger, as the principal official at MSC, states that the plaintiff's "overreaction to [an] unexceptional stimulus [was] disruptive behavior and an inmate behaving in such a manner must be removed from the cellblock to isolation." The warden confirms Johnson's averment that the plaintiff was not locked up for punishment. According to Bessinger, "He was placed in administrative separation to cool off [and] [h]e has not been charged with any institutional violation in connection with the incident."[3]

The defendants deny that Maxton has been threatened, harassed, or deprived of meals and showers, as he maintains. They allege that they have acted in good faith in all matters involved in this case, and acted solely to maintain order, security, and discipline in MSC. Prison logs reflect that the plaintiff had opportunities to shower on June 20, June 21, and June 25, according to Johnson. The defendants concede that Maxton missed about nine of the fifteen meals served in MSC while he was locked up, but they aver that the meals were refused by him because he went on a form of "hunger strike" to protest his confinement. Because of the hunger strike, the defendants directed that the plaintiff's condition

---

for his egregious misconduct in prison, he has no right to be moved to another facility of SCDC in the absence of a state-created right to serve his sentence at a facility away from Columbia that may be more to his liking. *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

**2.** Federal courts lack the authority to remove or reassign state employees. *Shole v. Daly*, No. 75–1704 (4th Cir. 1976), citing *United States v. Bridge Commission*, 275 F.2d 529, 535 (7th Cir. 1960), *cert. denied sub nom., Clippinger v. United States*, 364 U.S. 818, 81 S.Ct. 50, 5 L.Ed.2d 48 (1960).

**3.** From scores of cases filed in this district, the court judicially notes that the Maximum Security Center, as the name of that facility implies, is a penal facility that is operated separately from the Central Correctional Institution, inside the perimeter walls of which MSC is located.

MSC has its own warden and its own staff of officers. Inmates are sent to MSC to serve administrative sentences imposed by a prison disciplinary committee, for protective custody, and for safekeeping. There are two general areas of cells at the facility. The "hole," or the area of single cells, is on the lower level. The upper levels contain cells that are more preferred by inmates, for they are not wholly isolated there, and while the amenities in MSC are few, the prisoners upstairs receive a very limited number of amenities that are denied altogether to the prisoners in the "hole," or the lockup area.

It can thus be seen that the plaintiff was only transferred from one cellblock in MSC to another cellblock. He was already classified as a prisoner in maximum custody, and his denial of privileges available upstairs at MSC represented minimal matters, at most.

be monitored by prison medical technicians. No adverse symptoms were observed except for stomach spasms, which technicians attributed to the refusal of the plaintiff to consume regular meals. One of the two medical technicians who examined the plaintiff during the five day period ordered that he receive sweetened orange juice to alleviate the discomfort of the hunger spasms.

In his "return," the plaintiff insists that he went without a shower for one week. Then, in a direct contradiction of the sworn averment in his complaint, in which he said he refused meals on and after June 20th, the plaintiff denies that he went on a hunger strike. As though to qualify that contradiction, in a form of confession and avoidance, he adds, "Of course no one eats every scrap of food at every meal." He then states that he was "denied regular meals," but he admits that he was seen by a medical technician. He argues, however, that he should have been seen by a doctor. He states he was "threatened with physical harm," and he argues that the prison officials overreacted to the coffee-throwing incident, which he characterizes as an act of "harmless horseplay," and that confining him while not also confining his friend, Caldwell, violated his constitutional rights.

▮ This case represents yet another in a growing list of cases in which federal courts are being importuned by confined malcontents to interfere in the day-to-day operations of state prisons.[4] As earlier observed, the plaintiff seeks alternative injunctive relief that is not available under § 1983, and his somewhat desultory request for damages is not supported by his own equivocal statements of the facts concerning meals and showers while he was on lockup.[5]

▮ The custodians of state prisoners are obligated by law to maintain security, and they are required to take every reasonable step necessary to stifle or to suppress disruptive acts of inmates. It is a fact of prison life that disruptive conduct by only one prisoner can precipitate discord or even violence by other prisoners, if not checked promptly. If prison officials fail to take prompt action to control a disruptive inmate, and if that failure results in injuries to other inmates in an ensuing melee, a very real contingency would then arise that the inattentive correctional officials might become liable to the injured prisoners. Whether liability could be fixed or not, the injured inmates would file suits, in all probability, to seek damages for any injuries they received during the melee. For this reason, and also because competent and dedicated correctional officers try to perform their jobs properly, a correctional official who witnesses or learns of a disruptive incident in a prison—particularly a prison housing maximum security prisoners—must make a quick judgment as to the proper action required. He does not have the opportunity for calm reflection as to all the options available to him that a judge possesses when he reviews pleadings and affidavits in the relative quiet of his chambers.[6]

4. This case is Maxton's seventh civil rights suit. In addition to the two cases cited in fn. 1, he has filed *Maxton v. Murph*, No. M–5–70, dismissed December 16, 1975; *Maxton v. Butterfield*, No. 77–366, dismissed April 27, 1977; *Maxton v. McLeod*, No. M–5–91, dismissed July 7, 1977; *Maxton v. Graham*, No. M–5–106, rejected because of the employment by Maxton of vile and scurrilous language in his pleadings on January 18, 1978; and *Maxton v. Graham*, No. 77–2275, dismissed January 6, 1978. In this last mentioned case, the court advised Maxton that it would set up a method to censor his mail to this court if he persisted in the use of vulgar language that is wholly unnecessary, and which enjoys no constitutional protection in the context employed in his submissions.

The plaintiff also sought habeas corpus relief in *Maxton v. Martin*, No. 77–299, dismissed March 30, 1977, *appeal dismissed*, No. 77–8154 (4th Cir., October 27, 1977).

5. The denial of a shower for five days, or for seven days, would be a *de minimis* violation of a sanitary requirement, unless such denial were repeated on a recurring basis. *Cf. Sweet v. South Carolina Department of Corrections*, 529 F.2d 854 (4th Cir. 1975).

6. See *LaBatt v. Twomey*, 513 F.2d 641, 647 (7th Cir. 1975), where the court observed that the standard of judicial review of a prisoner's challenge to the sufficiency of a basis for emergency response to discord or strife in a prison must be "generous" to the prison administration. If

Given the unstable environment of a prison that houses numerous felons in close quarters, the fact that a correctional official may err at times is fully understandable. Therefore, if the plaintiff is accurate in his characterization of the defendants' action in locking him up for throwing hot coffee on another prisoner as an overreaction to "harmless horseplay," such overreaction does not represent a violation of the plaintiff's rights under the Constitution. At most, the lockup represented an error by a prison official in the exercise of the discretion placed in him by law to maintain the discipline and security that is required within the walls of a maximum security prison. Forms of "horseplay" that might be ignored in a military barracks, or which would go unnoticed by college provosts if engaged in by students in a dormitory, can be viewed rationally by prison officers as a threat to safety and security, if observed within a maximum security prison.[7] This is particularly true if one of the participants in such antics has achieved the reputation of a troublemaker, as the plaintiff has succeeded in doing.

The members of this court have been called upon to decide numerous cases brought by state prisoners who have claimed that their rights were violated because they were confined on lockup pending an investigation of alleged misconduct in a prison facility. Most cases have involved lockups pending the filing of disciplinary charges to be heard by a prison disciplinary committee. So long as the provisions of The Inmate Guide are followed in such procedures,[8] the cases have not presented constitutional issues for trial. Occasionally, a case has been presented where a prisoner has been detained pending an investigation of possible charges against him, and later charges were filed after the investigation has been concluded. In such a case, if the prisoner received a period of disciplinary confinement, he has not suffered from the prehearing detention, because he received credit on the administrative sentence for the time he spent on lockup awaiting a hearing.[9] It is only cases which involve preventive detention on lockup for longer than the periods specified in the Guide, while an investigation occurs, that have presented problems.[10] One such case of relatively recent origin involved the detention of an inmate (who was in B custody) for longer than thirty days without the filing of any charges pending a psychological evaluation of the prisoner's accountability for his somewhat bizarre behavior, which included loud demands to officers at a prison gate that he be released, made in the presence of inmates who assembled because of the confrontation. Prison officials decided not to charge the inmate, even though a psychologist did not find him to be incapable of realizing that his conduct violated prison rules. The Court of Appeals stated

---

there is no genuine issue as to the good faith of the prison officials who are forced to take emergency action to preserve order and discipline inside the prison, there is no justiciable federal issue, even if hindsight reveals that the action taken was unnecessary.

7. This observation is not intended to imply that the court accepts the premise that throwing hot liquid on another person is a form of horseplay. It is not. Depending on circumstances, the act could represent assault and battery in some degree.

8. The Inmate Guide, a 1977 prisoner manual, contains a description of disciplinary procedures followed in the South Carolina Department of Corrections. Such procedures comply with *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

9. The Inmate Guide provides for such credit in § 3.3, page 29 (1977 edition).

10. Some investigations are delayed because prisoners fail to give statements to investigators because they do not want to "rat" on another prisoner, or because they fear reprisals from other prisoners if they cooperate with prison officials who conduct investigations. Maxton concedes in his complaint that he refused to respond to Johnson's questions, and states that he told Johnson he was not a "rat."

See *Pope v. Jones*, No. 76–1144 (4th Cir. 1977), which upheld a North Carolina preventive detention regulation. See also *Waid v. Zahradnick*, No. 76–2361 (4th Cir. 1977), which teaches that where a regulation might not be followed precisely, a common-sense flexibility must be taken into account in judicially reviewing the alleged deviations from the regulation.

that the facts involved presented a material issue of "whether the supervisor [who ordered the lockup] in good faith complied with applicable penal regulations governing disciplinary confinement." [11] The case was remanded for a hearing as to whether the supervisor ordered the prisoner to be locked up as a disciplinary measure in order to punish the prisoner,[12] and the Court of Appeals left open the question of whether a violation by a prison official of a prison regulation in locking a prisoner up for longer than the time authorized by the regulation would give rise to a constitutional deprivation.[13]

■ The rule of law that one can derive from lockup cases is clear. A prisoner cannot be placed in a punitive confinement area to punish him for a disciplinary infraction unless the procedures employed by prison officials comport with the minimum due process standards set out in *Wolff v. McDonnell, supra.* As is true in so many areas of the law, however, particularly the rapidly developing law concerning the rights of prisoners and the concomitant duties of those harried officials who must run our nation's prisons, it is much easier to state the rule of law than it is to apply it in many cases. Thus, it is presently unclear as to whether a prison officer who locks a suspect up pending an investigation of alleged misconduct can legally hold that prisoner for a reasonably long period of time, if such time is required to determine whether the suspect should be charged, by merely notifying the suspect orally or in writing

that he is being detained pending the investigation. So long as prison officials are trying in good faith to solve the disciplinary offense so that charges can be filed, both reason and common sense would suggest that such confinement would be proper, if not mandatory in some situations.[14] Yet, no prison manual can be written that would take into account every breach of discipline or security inside a prison that requires a prison official to decide—almost instantly—whether and for how long preventive detention in a given situation would be required to maintain order, even though insufficient facts are known to draft a valid arrest warrant, or a statement of administrative charges to be referred to a prison adjustment committee.

The Inmate Guide represents a commendable effort to list disciplinary offenses, penalties for such offenses, and the procedures employed in disciplinary proceedings in the penal institutions of the South Carolina Department of Corrections. Yet, it contains no provision (which the court can find) to cover the facts revealed in this case, *i. e.* a lockup for five days to cool off an angry, recalcitrant prisoner who is known to have a "short fuse," and who throws hot coffee on another inmate standing outside the angry prisoner's door,[15] unless § 3.2(B)5 is applicable. The provision cited in *Poston v. Martin, supra* [temporary segregation for up to three days], would apply, but nothing provides for a lockup of five days, unless removal of an inmate already sentenced to MSC [16] to the downstairs ("hole") area of

---

**11.** *Poston v. Martin,* No. 79-6492, 605 F.2d 1204 (4th Cir., August 31, 1979).

**12.** The opinion cited a provision of the Inmate Guide, now contained in § 3.2(B)4, which empowers a supervisor to lock up an inmate for a minor violation of a prison rule for not to exceed three days.

**13.** The Court of Appeals cited *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), as seeming "to indicate that the regulation in question must be intended to secure to the adverse party a constitutionally protected right." Slip opinion, page 5, n. 2.

**14.** Threats against witnesses in criminal cases are no longer uncommon occurrences. The

mind rebels against the potential for violence in prison if inmate witnesses could be personally accosted by other inmates who know they plan to testify against them. See also *Pope v. Jones, supra.*

**15.** A literal reading of § 4.5(C) of the Guide suggests that the plaintiff could have been charged with (disciplinary) assault and battery, for which, if found guilty by an adjustment committee, he could have received from nine months to two years in administrative segregation, and comparable periods of time as debits to his good time.

**16.** See note 3, *supra.*

that prison unit from upstairs would represent a loss of privileges "granted at [the MSC] institutional level, for no longer than 30 days."

█ The defendants made no reference to the Guide in their answer and the affidavits submitted to support their motion for summary judgment. Their position seems to be a contention that, on the facts revealed in this case, they have a duty to lock up a belligerent inmate to maintain discipline and security in MSC in the discharge of their duties there. Although this court finds no fault with such contention, it would be preferable for The Inmate Guide to be amended to expressly authorize preventive detention when it is necessary to utilize that tactic to control an unruly inmate.[17] If this amendment cannot be made within the framework of existing policies and procedures approved by the Department of Corrections, it is easily foreseeable that additional cases similar to this one will be filed by inmates who are prone to litigate every decision of correctional officers with which writwriters in prison may disagree.[18]

Although the action of locking up the plaintiff for five days does not appear to be a sanction that is expressly provided for in The Inmate Guide, the court holds on these facts that no constitutional right of the plaintiff was violated. Such confinement of an inmate who engages in disruptive conduct (without adequate provocation to justify a disruptive act) would not necessarily involve a constitutional violation of the inmate's right to procedural due process. *Boisseau v. Zahradnick*, 578 F.2d 1378 (4th Cir. 1978); *Bragg v. Wolfe*, 580 F.2d 1047 (4th Cir. 1978).[19]

█ The deprivations of which Maxton complains do not present constitutional issues that must be tried. If any defendant in actual fact threatened him verbally, such a threat is not actionable, for words do not

17. Specific standards are preferable to a necessity for prison officials to handle each case on an *ad hoc* basis. See *LaBatt v. Twomey*, supra, 513 F.2d at 647, n. 6. The violence involved in that case was far more serious than the plaintiff's act here, but the case recognizes "the diversity of emergency situations which may occur within correctional institutions."

18. The Court of Appeals stated in *Arey v. Turner*, No. 74–2360 and consolidated appeals (4th Cir. 1975), that "federal courts are not ombudsmen to whom state prisoners may turn when they disagree with the normal operations of penal institutions," and that "§ 1983 provides a forum solely for the litigation of claims of constitutional magnitude." The Supreme Court has said essentially the same thing in different language. Addressing all lower federal courts as well as prisoners, it has reminded all those persons who would second-guess prison administrators that "judgment calls" as to the best methods to use in running prisons "are confided to officials outside of the Judicial Branch of Government." *Bell v. Wolfish*, 441 U.S. 520, at 562, 99 S.Ct. 1861 at 1886, 60 L.Ed.2d 447 (1979).

19. In *Boisseau*, a Virginia prisoner was transferred from a field unit of the penal system to the main penitentiary because of his involvement in a disturbance at the field unit. Upon arrival at the penitentiary, he was placed in the isolation section because of overcrowded conditions elsewhere. When space became availa-

ble several weeks later, he was moved to the segregation section. The penitentiary warden, through an oversight, failed to arrange for the prisoner to be given a reclassification hearing that was required by prison guidelines. Summary judgment for the warden was affirmed by the Court of Appeals. That court held that the transfer and reclassification were acts entrusted to the discretion of prison officials, who had acted in good faith, and that the "failure to give the prisoner a hearing, even though amounting to a technical violation of administrative guidelines, did not amount to a violation of constitutional rights." The court cited *Meachum v. Fano, supra*, and *Cooper v. Riddle*, 540 F.2d 731 (4th Cir. 1976), as to the transfer and change of custody, and *Altizer v. Paderick*, 569 F.2d 812 (4th Cir. 1978), as to the missed hearing.

*Bragg* involved a prisoner who was moved from one part of a jail to an isolated area in the same jail because he had "made statements which, in the unstable environment of a jail, could rationally have been thought to pose a present danger to jail security." The prisoner, as has Maxton, had acquired a reputation as a troublemaker among jail officers. The case involved facts that occurred before *Wolff v. McDonnell* was decided, but the trial court concluded that the transfer was irrational and arbitrary. The Court of Appeals disagreed, and held that on the facts presented, the transfer was justified.

constitute an assault.[20] Assuming the fact that he was denied an opportunity to take a shower for the week of June 20 to June 27, that denial, if not repeated, would not present an issue for trial, as earlier observed. In view of the plaintiff's own averment in his verified complaint that he refused to eat after he was locked up, his later argument that he was "denied regular meals" is a contradiction of his own earlier claim.[21] The plaintiff's conclusory allegation that he has been harassed by the defendants is unsupported, except for the specific incidents which have been found to be lacking in merit as justiciable constitutional issues. Although the alleged pain the plaintiff experienced was unfortunate, his claim that he was denied medical attention for "stomach problems" by a medical doctor, viewed in the context of his hunger strike, fails to state a claim under the rationale of *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), for he falls far short of alleging facts that would indicate that any defendant (or the medical technicians who saw him) deprived him of necessary medical attention for a serious medical need.

For the foregoing reasons, the defendants are entitled to summary judgment, which shall be entered by the Clerk.

IT IS SO ORDERED.

20. *Morris v. Sheffer*, No. 74–2086 (4th Cir. 1975).

21. Where the facts pleaded by a prisoner contradict his claim, the action is dismissible for that reason alone as to such contradictory issue. *Henderson v. Pate*, 409 F.2d 507, 509 (7th Cir. 1969).